EPHRAIM NELSON ET AL. v. THE CHEBOYGAN SLACK-WATER NAVIGATION COMPANY.

*Improvement of navigable streams—Tolls.*

It is not competent for the State to give the control of one of its navigable streams to private parties for improvement, with power to charge toll at discretion. *Semble.*

But it is competent to authorize such parties to charge toll, at rates fixed by the legislature, for the use of improvements made by them. And the provision in the Ordinance of 1787 that the navigable waters of the Northwest Territory shall be "forever free" does not interfere with this, as the meaning of that provision is that the use of the waters in their natural condition shall be free. *Benjamin v. Manistee etc. Co.* 42 Mich. 628.

Tolls for the use of the improvement of a navigable stream may be charged, notwithstanding the stream was capable of such use in its natural condition, provided the improvement facilitated it.

The question whether a navigable stream has been dammed without permission of the board of supervisors will not be considered on error, when the record does not show it was raised in the court below.

Error to Cheboygan. Submitted April 28. Decided June 11.

TRESPASS ON THE CASE. Plaintiffs bring error. Affirmed.

*Watts S. Humphrey* and *Atkinson & Atkinson*, for plaintiffs in error.

*G. W. Bell* and *C. I. Walker* for defendants in error.

COOLEY, J. This is a suit to recover of the defendant a considerable sum of money which the plaintiffs have paid under protest, as tolls for passing through a canal around a dam constructed by defendant across the Cheboygan river about a mile above its mouth where, before the construction of any dam, there were rapids. To an understanding of the legal questions it is necessary to have some knowledge of the water-courses which find an outlet by way of this river.

The stream named the Cheboygan is eight miles long, passing from Mullett lake to Mackinaw straits. Mullett lake is twelve miles long by three or four wide, and is connected with Burt lake of like size by Indian river, a stream five miles long. Crooked river, five miles long, connects Crooked lake, six miles long and a mile wide, with Burt lake. Round lake, about a mile in diameter, is near Crooked lake and connected with it. About five miles above the mouth of the Cheboygan river, Black river comes into it. This is a stream sixty miles long, and passes through Black lake, which is ten miles long and three wide. Rainy river, thirty miles long, empties into Black lake. Pigeon river, forty miles long, empties into Mullett lake. Sturgeon river, seventy miles long, empties into Indian river. Maple river, thirty miles long, empties into Burt lake. Two small steamers, capable of carrying a hundred passengers each, navigate the waters from the head of Crooked lake to the straits of Mackinaw. All the waters mentioned are made use of for floating logs and lumber on their way to the place of manufacture or to market, and vessels drawing five feet of water run up to the head of Mullett lake, and those drawing two and a half feet to the head of Crooked lake. Freight boats and lighters are also used on Black river.

In the year 1847 a dam was built by one McLeod across the Cheboygan river where that of the defendant now stands. It was not so high as defendant's dam now is, but high enough to raise the water so that such craft as the plaintiffs now make use of on the river could navigate it to Mullett's lake.

The case does not show how or why McLeod came to build this dam, nor how the defendant comes to be now in possession of its site with a higher dam. In 1867 an act of the Legislature was passed to provide for the• incorporation of slack-water navigation companies for the improvement of rivers in the counties of St. Joseph, Cass, Berrien and Cheboygan, and in the following year defendant was organized and constructed the dam complained of. By the act of incorporation any company that should be formed was authorized to take possession of any navigable river proposed to be improved, and to improve the same by the erection of dams and the construction of locks, and it was provided that "said river, when so improved, and the lock constructed by such company, shall be deemed and taken to be public highways, and free to all persons whatever, to pass and repass with their boats and other water craft, and with their produce, goods and chattels, wares and merchandise, such persons conforming to such rules and regulations as may be established by the company for the navigation of such river, and paying such tolls as may be established and required for the same by such company:" 2 Laws of 1867, p. 840. As the act did not in any way limit the tolls that might be charged. by the companies formed under it, or confer upon any public officer or authority the right to limit them, or to supervise the action of the companies in any manner, it was in effect an act to transfer to voluntary organizations the control of navigable streams, with power to levy burdens upon commerce at discretion, and was probably inoperative under the principles laid down in *Ames v. Port Huron etc. Co.* 11 Mich. 139. But in 1871 this power was restricted, and a schedule of tolls which might be charged was fixed by legislation: General Laws 1871, p. 176. The constitutional validity of these acts was contested, but the lawful existence of defendant as a corporation was affirmed in *Nelson v. Cheboygan etc. Co.* 38 Mich. 204.

To prove a personal grievance the plaintiffs gave evidence tending to show that they owned a mill above the dam, and used in their business a tug and several lighters; that in 1876 the tug made a hundred and sixteen trips each way, and the

lighters two hundred and six trips up and two hundred and four trips down; that in 1877 the lighters made forty-eight trips up and forty-nine trips down; that in going up they were light and drew ten to twelve inches of water; that in going down they were loaded and drew from three to three and a half feet of water; that plaintiffs sent over the waters of the Cheboygan in 1876, 7,596,000 feet of lumber and a considerable quantity of wood, bark and shingles, 1,151,000 feet of the lumber being shipped on the lighters and the remainder on rafts to the mouth of the river; that the dam, so far as vessel navigation and rafts were concerned, completely obstructed the stream, and to get around it with their tugs, lighters and merchandise, plaintiffs were compelled to use defendant's canal, for which defendant compelled them to pay tolls, amounting in all to $2767.70; that in the natural stage of water in the Cheboygan river without any dam the lighters used by the plaintiffs could have passed in the condition they were in on their up trips—that is, unloaded—and that rafts of lumber could have been run down. This constituted the case for the plaintiffs.

It was decided in *Benjamin v. Manistee River etc. Co.* 42 Mich. 628, that the State might lawfully authorize corporations to make improvements of navigable rivers and to charge tolls for the use of the same, notwithstanding the compact in the Ordinance of 1787 that the navigable waters of the Northwest Territory should be forever free. The tolls, it was said in that case, are not charged for the use of the navigable river thus made free, but are imposed in respect of the improvements, and to obtain the benefit thereof, and the compact itself might have been a curse to the Territory instead of the blessing it was meant for, had it required the water highways of the Territory to remain unimproved in order that they might be used in their natural condition without toll or impost. That case governs this, to the extent at least of determining the general question of the right to take tolls.

But it is insisted on the part of the plaintiffs that the right to the free navigation of public streams must still exist, notwithstanding the improvements, as to whatever property or

vehicle of commerce might previously have navigated them. Also that defendant can have no right to stop at its dam and require tolls for the passage through its canal of that which before the dam was built would have floated in the river at that point, thereby making the improvement a burden on such navigation as did not need it. The true construction of the act under which defendant is organized is claimed to be, to give the company a right to charge tolls to those who need and use its improvements, and it is only permitted to obstruct such navigation as the stream in its natural condition is capable of, on condition that it provides locks for getting around its obstructions, and makes them free.

We do not think the broad question which the plaintiffs attempt to raise is in the case. There was no attempt in the court below to show that the commerce carried on by the plaintiffs was not facilitated by the improvement, or that any portion of it was burdened with tolls for the use of that which did not benefit it. It was shown, negatively at least, that the tug and lighters required the facilities of the canal in passing down, and though it was proved the lighters could have passed up unloaded before the dam was constructed, it did not appear that their going up, when they could not also go down, would be of advantage to the interest of any one. The rafts, it was shown, could have passed down before, but whether as conveniently and safely did not appear. It is consistent with everything appearing in the record that every use made by the plaintiffs of the river was facilitated by the construction of the dam and canal. If they were so, the exaction of tolls for the use of the canal was as proper and just as it would have been if the dam had first made the use of the waters practicable. The tolls are charged in respect to the enjoyment of benefits conferred by the expenditures of defendant; and whether these benefits originate with the improvement the defendant has made, or are only enhanced by it, is immaterial to the justice or legality of the impost.

It is further contended that defendant is the successor and assign of McLeod in respect to this dam, and is charged with all his duties; and that there was legislation under which

McLeod built which required him to construct a lock for the passage without charge of whatever navigated the river. The deduction is that defendant must maintain such a free passage now. But in the first place no such legislation appears to have been brought to notice in the court below, and in the second place it is not shown that defendant is the assign of McLeod. The supposition that McLeod may have abandoned his dam as useless, is consistent with anything that appears in the evidence; and in that case the appropriation of it by any one else who should find it a convenience in improving the river would have been perfectly proper, provided the authority of the appropriator from the State was such as would justify the erection as a new one. Certainly so long as defendant does not claim under McLeod, or need any grant McLeod may have had to justify damming the river, his obligations cannot be said presumptively to have been assumed by it.

But it is said that defendant must claim under McLeod, who built his dam before the present Constitution was adopted, because since that time no dam can be constructed across a navigable stream except with the consent of the board of supervisors of the county, which defendant has never obtained. The conclusive reply to this suggestion is that no question of the consent of the board of supervisors appears to have been made in the court below, and we neither know what the fact was, nor could we act upon it if we did. We sit here to review only the rulings of the circuit judge.

The circuit judge gave instructions to the jury corresponding to the views above expressed, and verdict and judgment were rendered for defendant.

This judgment must be affirmed with costs.

The other Justices concurred.