The Underwood Lumber Co. vs. The Pelican Boom Co. and others.

THE UNDERWOOD LUMBER COMPANY, Respondent, vs. THE PELICAN BOOM COMPANY and others, Appellants.

THE UNDERWOOD LUMBER COMPANY, Appellant, vs. THE PELICAN BOOM COMPANY and others, Respondents.

*February 1 — February 25, 1890.*

*Navigable rivers: Booms: Charges.*

1. It is competent for the state to authorize the owners of booms in navigable rivers to charge compensation, at rates or within limits fixed by the legislature, for the use of such improvements and for their services in receiving, sorting, storing, and delivering logs and timber. A limitation to fifty cents per thousand feet as a maximum charge, *held* to be within the legislative discretion.

2. In determining what is a reasonable compensation for such services, the value of all property or rights of property necessarily devoted to or used in the performance thereof, all labor necessarily employed, all disbursements necessarily made, and all expenses necessarily incurred, should be considered.

APPEALS from the Circuit Court for *Waupaca* County.

The following statement of the case was prepared by Mr. Justice CASSODAY:

It appears from the record that Boone lake is situated mostly on section 31, town 37, range 9 east; that the out-

let of said lake is through an arm of the same, southerly into the Wisconsin river, at or near the line between that section and section 6, town 36, of the same range; that in 1878 the defendants the *Browns* and *Anderson* owned fractional lots 1 and 11, bordering on said river in said section 6, and fractional lots 4, 5, and 6, bordering on said lake in said section 31; that in 1878 Stewart and others, without any express authority from the state, constructed a dam about twelve feet high, across said river, on lands belonging to the said *Browns* and *Anderson* in said section 6, and kept up and maintained the same until it came into the possession of the *Browns* and *Anderson*, in 1882; that, on or about March 25, 1882, the said *Browns* and *Anderson* made, signed, and acknowledged written articles of incorporation of the defendant " *Pelican Boom Company*," under ch. 86, R. S., and the several acts amendatory thereof, " for the purpose of improving a portion of the Wisconsin and Pelican rivers and Lake creek, and the lakes and streams tributary to said Lake creek, and being tributaries of the said Wisconsin river at and near Pelican Rapids, . . . and for the purpose of storing, sorting, and delivering thereon saw-logs " and timber, " and for storing, holding, and handling logs and timber, and to facilitate the running thereof," within the territory described; that said corporation was so organized without stock, but with the usual officers, duties, and powers; that April 7, 1882, by ch. 247, Laws of 1882, the said *Browns* and *Anderson*, " *their heirs and assigns*," were expressly " authorized and empowered to build, erect, keep up, and maintain a dam, not exceeding six feet in height, to be used for manufacturing and booming purposes, across the Wisconsin river, on the north half of " said section 6, and not more than 100 feet from said Stewart dam, provided that the same should " not raise the water in said river at the mouth of the lake . . . to exceed two feet," and to contain a slide or chute to allow

"logs passing over it to freely pass down the river;" that, in and by said act, the said *Browns* and *Anderson*, "*their heirs and assigns*," were expressly "authorized and empowered to build, erect, keep up, and maintain, in connection with said dam, a system of piers and booms in and along and across said river on sections 6 and 31 aforesaid, on and opposite lands owned by them, for the purpose of dividing, booming, holding, sorting, and handling logs, timber, and lumber," to be constructed as prescribed, and subject to alteration, amendment, and repeal; that March 7, 1887, the *Browns* and *Anderson*, by warranty deed, conveyed to the *Pelican Boom Company*, its successors and assigns, "all their shorage, riparian, marginal, and flowage rights and easements in and to all" the lands described, adjacent to the Wisconsin river and its tributaries, above and to the northward of said dam, on lot 11 in section 6, and also lots 2, 3, 4, 5, and 8, in said section 31, and three mill lots described in Rhinelander, with the right and privilege in said lands to overflow the shores and banks of said river and its tributaries on said lands, and to use said shores for the purpose of booming, driving, and dividing logs, and in constructing and maintaining booms and piers.

April 23, 1887, by ch. 253, Laws of 1887, the said *Browns* and *Anderson*, "*their heirs and assigns*," were expressly "authorized and empowered to build, erect, keep up, and maintain a dam not less than twelve feet in height, to be used for manufacturing, booming, and flooding purposes, across the Wisconsin river" on said section 6, with power to them, "their heirs and assigns," to overflow all such lands as might be necessary for such purposes, and to acquire title to all such lands by condemnation proceedings, as prescribed in sec. 1777, R. S., as amended by ch. 318, Laws of 1882, and also "to build, erect, keep up, and maintain, in connection with said dam, a system of piers and booms in, along, and across said river," in said section 6, "and from

the *present dam* " to the north line of said township 37, "in and opposite lands owned or acquired by them" for said purposes, and as prescribed. Said act further provided that "all logs and timber destined to points on said river below said dam shall be taken by the owner or owners of said dam, when they reach the flowage thereof, and shall be driven by said owners, *free of charge* and with reasonable dispatch, through the pond and flowage created by said dam and over the same;" that the owners of the dam should not be entitled to compensation for the use of said dam or the waters of such pond for flooding purposes as therein provided; that said act should "be applicable to and govern the owners of the dam" already built as aforesaid, and that said dam should thereafter "be kept up and maintained only under the provisions and restrictions" of said act.

It also appears that on or about December 26, 1887, said articles of incorporation, so made, signed, and acknowledged in 1882, were amended, and, among other respects, so that the capital stock of said corporation should be $50,000, divided into 100 shares of $500 each, and at least one share to be purchased and held by each member thereof; that on or about December 28, 1887, in consideration of $12,500 in the said capital stock of the said *Pelican Boom Company*, the said *Browns* and *Anderson*, respectively, with their wives, conveyed to said company "all the interest" they had, possessed, or might "be entitled to, in the booms, piers, dam, works, and improvements, and all rights, interest, and property connected therewith and pertaining thereto, made, erected, or used by the *Pelican Boom Company*," as aforesaid.

It appears, further, that since the organization of the plaintiff corporation in 1887 it has been the owner of several thousand acres of pine timbered lands, which timber was capable of being put into said Wisconsin river and its

tributaries, and driven into said booms and pond formed by said dam; that the plaintiff, in 1887, contracted with a firm to furnish, at the mill of such firm at Rhinelander, 40,000,000 feet of such timber, to be manufactured into lumber for the plaintiff during the years 1887, 1888, 1889, and 1890; that during 1887, the boom company "divided, sorted, boomed, and delivered to the plaintiff, at said mill" of said firm, about 5,000,000 feet of logs, for which it charged and exacted, as a condition of such delivery, and the plaintiff before the commencement of this action paid, thirty-five cents per thousand feet; that April 12, 1888, and before the season for booming logs that year commenced, the boom company resolved thereafter to charge forty cents per thousand feet for booming logs during the year of 1888, and a notice to that effect was thereupon published in a newspaper at Rhinelander, and served upon the plaintiff; that thereupon, and on April 13, 1888, the plaintiff delivered to the boom company a notice in writing in effect requesting the boom company to "stop, assort, divide, and deliver, to Baird & Robbins' mill, all " its logs bearing the marks named therein; that thereafter, and during 1888, and before the commencement of this action, September 20, 1888, the plaintiff cut, logged, and drove down the Wisconsin, to said boom company's dividing works, about 15,000,000 feet of logs, and the said boom company had divided, sorted, and delivered to the plaintiff at said mill nearly ten and a half million feet thereof; that the plaintiff had paid thereon $3,307.92; that the boom company exacted and demanded; for the logs so divided, sorted, and delivered during 1888, forty cents per thousand feet, and declined to take less.

Thereupon, and on September 20, 1888, the plaintiff commenced this suit in equity, alleging, in effect, that the plaintiff was compelled to pay and did pay to the said boom company, for such dividing, sorting, booming, and delivering during 1887, an excessive amount and an un-

The Underwood Lumber Co. vs. The Pelican Boom Co. and others.

reasonable rate of charges; that while the plaintiff had offered to pay thirty-five cents per thousand feet for such services during 1888, yet that such amount was exorbitant, unreasonable and excessive; and praying the court, in effect, to fix the proper charges for such services for 1888, and thence continually; to fix the basis for subsequent charges; to authorize the plaintiff to remove its logs upon paying such reasonable charges; and enjoining the defendants from interfering, and requiring the boom company subsequently to receive, boom, and deliver to the plaintiff all logs at the terms which might be thus fixed.

The defendants took issue by answer, and insisted upon the right to fix such charges at the rate named or any reasonable rate not exceeding forty cents per thousand feet.

Upon the trial, the court made voluminous findings of fact, and also conclusions of law, to the effect that the boom company was entitled to charge for such services thirty-five cents and no more per thousand feet during 1888 and until the further order of the court; that the boom company was entitled to charge for such services, for the years subsequent to 1888, such a sum as would reimburse it for the cost of performing such services, provided the same were properly and reasonably performed, and as would cover the necessary annual repairs to their works, and yield a fair income on the capital invested, due regard being had to the nature and probable duration of the business; that the boom company be enjoined and commanded to receive all logs and timber belonging to the plaintiff, and to perform all services thereon of the character mentioned, and deliver the same at said mills, upon the payment of thirty-five cents per thousand feet; that such should be the rate of boomage during the season of 1888 and for all logs thereafter delivered until the further order of the court; that, in case of change of circumstances, either party was at liberty to apply on petition, on the foot of the judgment,

for a modification of the amount of charges so fixed. Upon such findings judgment was entered accordingly. Thereupon the respective parties appealed from said judgment and the whole thereof.

*E. Mariner* and *Frank M. Hoyt*, for the plaintiff.

For the defendants there were briefs by *Alban & Barnes*, attorneys, and *Wm. H. Seaman*, of counsel, and the cause was argued orally by *John Barnes* and *Mr. Seaman*.

CASSODAY, J. The *Pelican Boom Company* was created and organized without stock in 1882, under ch. 86, R. S., and the several acts amendatory thereof, for the purposes set forth in the foregoing statement. Before the grievances complained of, the articles of incorporation of the company were amended, and the same was thereby made a stock company; and the property belonging to the *Browns* and *Anderson*, and the rights, authority, and power acquired by them under ch. 247, Laws of 1882, and ch. 253, Laws of 1887, were transferred and conveyed to said corporation, as set forth in said statement. Since such rights, authority, and power were by said chapters 247 and 253 expressly granted, not only to the *Browns* and *Anderson*, but to their "heirs and assigns," there can be no question but what the *Browns* and *Anderson* were thereby empowered to make such transfers and conveyances to the boom company. *Willamette Mfg. Co. v. Bank of British Columbia*, 119 U. S. 191; *Green Co. v. Conness*, 109 U. S. 104; *Clark v. Barnard*, 108 U. S. 436. It is equally apparent that the boom company, by virtue of its incorporation, was authorized and empowered to make the improvements, exercise the authority, and acquire and hold the property, as mentioned in said statement; and hence that such transfers and conveyances were complete and effectual. Sec. 1777, R. S., as amended by ch. 318, Laws of 1882, and sec. 1777a, S. & B. Ann. Stats.; ch. 279, Laws of 1880. Among the powers, grants, and

privileges thus acquired by such act of incorporation were included "the right to collect toll or boom charges, and have liens therefor." Sec. 1777a, S. & B. Ann. Stats.; ch. 279, Laws of 1880. That section also expressly declared that the provisions of sections 12–16, 18, and 24 of ch. 45, P. & L. Laws of 1871, entitled "An act to incorporate the Wausau Boom Company," as amended, should apply to corporations formed thereunder, except as to the Chippewa river and its tributaries. For the purposes of this case, therefore, the sections of ch. 45, P. & L. Laws of 1871, mentioned, must be regarded as a part of said sec. 1777a, S. & B. Ann. Stats.; ch. 279, Laws of 1880. Of these sections, the thirteenth provides that "said company shall demand and receive, and are hereby authorized, by law, to collect, upon all logs and timber received, retained, or stored in their said booms, such sum as may be determined upon and provided by the said board of directors, not exceeding the sum of fifty cents per thousand feet for each and every thousand feet of logs or timber so as aforesaid received or stored in said booms, and which shall be due and payable as soon as the amount thereof is ascertained."

It is in effect conceded that, in pursuance of such authority, the defendant company thus determined upon and fixed the sum or compensation for such services at forty cents per thousand feet, as set forth in the foregoing statement. That amount was exacted and demanded by the boom company for the season of 1888, but the plaintiff refused to pay that amount, on the ground that it was unreasonably excessive. The court found that the plaintiff was entitled to receive, for the season of 1888, thirty-five cents per thousand feet. The plaintiff insists that even that amount is unreasonably excessive, and hence its appeal from the judgment; while the boom company claims that it is entitled to forty cents per thousand feet, as thus fixed by the company, under the authority conferred by the statute under its charter, and

hence the defendants' appeal from the judgment. The mass of evidence in the case, and much of the findings, are devoted to the question as to what were reasonable charges, and the elements which should serve as a basis for such estimate. On the part of the plaintiff it is claimed that the charges of the boom company should be limited to reasonable compensation for services rendered and interest on capital invested, including repairs, but nothing for the advantages of the stream in its natural condition, nor for riparian ownership; while the boom company contends that, in estimating such reasonable compensation, the value of its plant and riparian rights, and all its property, operating expenses, and repairs, should be taken into consideration. It seems to us very clear that the value of all property and rights of property necessarily devoted or used, and all labor or service necessarily employed, and all disbursements necessarily made, and all expenses necessarily incurred, by the boom company in receiving, sorting, storing, and delivering logs and timber, should be considered in determining what is a reasonable compensation for such services. *Pere Marquette Boom Co. v. Adams*, 44 Mich. 403.

But it is very obvious that the amount of such reasonable compensation will not necessarily remain the same precise sum during every season and under every variety of circumstances. Much will necessarily depend upon the character of the seasons,— whether the freshets are high or low,— continuing long or short; the quantity and character of logs and timber to be so received, sorted, stored, and delivered; and the quantity and character of logs and timber passing down the river below, and from which they are to be separated, but for which no charges can be made. The difficulty in fixing such standard of compensation from evidence is pointed out by Mr. Justice COOLEY in the case cited. He there suggests "the importance of some legislation for fixing the charges, either by statute directly, or by

some board or local authority empowered for the purpose."

"The right to collect toll or boom charges," given by sec. 1777*a*, S. & B. Ann. Stats. (ch. 279, Laws of 1880), is manifestly limited to compensation for the use of improvements and services therein mentioned, and has no reference to "any tax, impost or duty" for the mere use of such navigable streams and waters as require no improvement to facilitate such navigation, and which are forbidden by sec. 1, art. IX, Const. This distinction is clearly pointed out in *Wisconsin River Imp. Co. v. Manson*, 43 Wis. 261–266; *J. S. Keator Lumber Co. v. St. Croix Boom Corp.* 72 Wis. 80–88, and cases there cited. See also *Nelson v. Cheboygan S. W. Nav. Co.* 44 Mich. 10. In the language of the present chief justice in the case cited: "The legislature is, primarily at least, the judge of the necessity of the improvement; and when it delegates the power to a corporation, and the state does not question that the improvement made by the corporation is in conformity with the delegated power, it seems to us that neither the necessity nor usefulness of the improvement, nor the manner in which it is made, can be called in question by private parties." *Wisconsin River Imp. Co. v. Manson*, 43 Wis. 265; *J. S. Keator Lumber Co. v. St. Croix Boom Corp.* 72 Wis. 81. So "the legislature is, primarily at least, the judge of" what constitutes a reasonable compensation for the use of such improvements and such services. It may be incompetent for the state, as held in Michigan, "to give the control of one of its navigable streams to private parties for improvement, *with power to charge toll at discretion.*" *Nelson v. Cheboygan S. W. Nav. Co.* 44 Mich. 10. We are not here called upon to determine that question. It is enough here to say that we fully agree with that court in holding, in effect, that it is competent for the state to authorize such parties to charge compensation at rates or within limitations fixed by the legislature, for the use of such improvements and

for such services.   Here the boom company was limited by
the legislature, in fixing its charges for such compensation,
to a sum not exceeding fifty cents per thousand feet.   We
are constrained to think such amount was within the leg-
islative discretion.   The boom company fixed the amount
at forty cents per thousand feet.   It seems to have been
reasonable.

*By the Court.*— The judgment of the circuit court is af-
firmed as to the plaintiff's appeal, and wholly reversed upon
the appeal of the defendants, and the case is remanded
with directions to dismiss the complaint.