GEORGE N. HUTTON, et. als., partners in manufacturing lumber, v. THOMAS M. WEBB, Sheriff, and THE BOARD OF COMMISSIONERS OF BURKE COUNTY.

(Decided May 10, 1899).

*Floatable Streams—Catawba and Johns Rivers Assessments Act 1897, Chap 388—Constitution, Art. VIII, Section 4.*

1. The right of taxation or assessment is a grant of sovereign power, and can only be exercised for the public good, and not for private benefits or for corporate gain, unless such gain be incident to the public benefit.

2. While the Legislature may by proper enactments provide for the improvement of navigable and floatable water ways for the *benefit of navigation,* it can not impose duties upon the commerce upon such waters. for the purpose of building bridges or cleaning out fords, public and private, across such water courses.

3. The Act of 1897, chapter 388, appointing a Board of Managers to provide for removing driftwood from the Catawba and Johns Rivers, between points named, which may gather at the shoals, on said streams, at low water, so as to obstruct fords used for public and private crossings, or pond back the water —and empowering the Board to ascertain the number of logs floated down said streams, and to impose an assessment upon each log, the fund derived to be apportioned among the Counties of Burke, Catawba and McDowell, and to be used for the purpose of keeping the fords clear and for building bridges— is manifestly an Act passed for the benefit of these Counties, and not for the public good, and is in contravention of the Constitution, Art. VIII, Section 4, inhibiting abuse in assessment, and is in conflict with the whole tenor and spirit of the Constitution, and of our institutions.

CIVIL ACTION for injunction relief to restrain the defendants from enforcing an assessment on the property of plain-

tiffs, and from interfering with their floatage of logs down the Catawba and John Rivers.

A temporary order of restraint was granted by *Robinson, J.,* in this cause pending in BURKE Superior Court, and came to a hearing, by consent, before *Bryan, J.,* at Chambers at Raleigh, on 25th October, 1898, and was heard upon affidavits from both sides by his Honor.

The complaint alleged that the plaintiffs were engaged in the manufacture of lumber in this State, owning planing mills and a saw mill plant in Catawba County—also owning large quantities of stand timber on the Catawba and Johns Rivers, and also owning a large quantity of cut logs, and are purchasing large quantities of logs to supply the milling plant, and that their only convenient way of getting the same to said plant is by floating them down said Rivers, which are floatable streams.

That the defendant Commissioners have caused an assessment of $275.50 to be made upon their logs, and have required the defendant sheriff to collect the same, and that he has levied upon 150,000 feet of their sawed lumber and has advertised it for sale.

That the defendants are professing to act under color of an Act of the Legislature ratified March 9, 1897, (Act 1897, Chap. 388), which in terms attempts to authorize the Board of Managers mentioned therein to exact such tolls for the purpose of removing of driftwood "that may gather at the shoals on said streams, when the water is low, so as to obstruct fords used for public and private crossings, or pond back the water at any point" on said Rivers, and also for the purpose of building certain public bridges over the said streams; that the plaintiffs are advised that the said Act is invalid and void, in that the Legislature has no power to authorize assessments for such purposes on the plaintiffs and others of the public

engaged in the exercise of the paramount right of navigation by floating of said streams, and that the duty of building such bridges and clearing out of such fords from driftwood is imposed upon the public generally to whose benefits it enures, and not upon these plaintiffs alone and those similarly engaged in the floatage of logs in said streams who receive no peculiar benefit from the building of such bridges or the clearing out of such fords, apart from the general public, being in no wise necessary to, or in furtherance of, the floatage of logs during the seasons when said streams are floatable.

The answer sets up the Act of 1897, Chap. 388, as a full and complete authorization of the acts of the defendants, complained of by plaintiffs. His Honor continued the injunction until the final hearing. Defendants excepted and appealed.

*Messrs. A. C. Avery* and *J. M. Mull,* for defendants (appellant).
*Messrs. Shepherd & Busbee,* for plaintiffs.

FURCHES, J., delivers opinion of the Court.
MONTGOMERY, J., dissents.
CLARK, J., delivers dissenting opinion.
DOUGLAS, J., delivers concurring opinion.

FURCHES, J. We think the judgment below should be affirmed. To our minds there is too little resemblance in a public turnpike road and a navigable water course to afford analogy for argument, from which proper conclusions may be drawn. The turnpike is created by legislation and can be abolished by legislation. But a navigable water course is not created by legislation and can not be abolished by legislation.

It is true that the Legislature may by proper enactment

provide for the improvement of such waterway for the *benefit of navigation.* But the Legislature can not impose duties upon the commerce upon such waters, for the purpose of "building public bridges, and of cleaning out the fords, public and private, across" such water courses. The right of taxation or "assessment" is a grant of sovereign power and can only be exercised for the public good. This sovereign power can not be granted for private benefits or for corporate gain, unless such gain be incident to the public benefit, authorizing the exercise of the taxing power of government.

It is manifest from the provisions of this Act that it was passed for the benefit of the Counties of Burke, McDowell and Caldwell, and not for the public good—the improvement of the navigation of the streams therein named, as their improvement for such purpose is not mentioned. The duty of this "board is to remove driftwood (that may gather at shoals on said streams when the water is low, so as to obstruct fords used for public and private crossings, or pond back the water) at any point on the Catawba River," etc. And this board is to provide for the ascertainment of the number of logs floated and to *fix the charge thereon;* and "after paying for keeping the shoals as aforesaid and for ascertaining the number of logs floated, any residue of the fund arising from said tolls shall be divided among said Counties." This board is to report to the Commissioners of each of the Counties the respective part of dividends that belong to it, and the Commissioners shall "assess the same" and enter up judgment for said amount against the parties assessed, and execution shall issue thereon "as for other tax assessments." This Act was passed in the Spring of 1897, and under its operation the plaintiff was taxed $275.50 in the Spring of 1898, and his property advertised for sale. But few private business enterprises in this State can stand such an assessment as this. In

our opinion, it is in contravention of the provision Article VIII, Section 4, of the Constitution, there being nothing in the Act limiting the power or extent of taxation.

But outside of this provision of the Constitution, we do not believe it can be sustained. It provides for the levy of "taxes or assessments" on private property for private benefit, and not for the public good. It is in conflict with the whole tenor and spirit of the Constitution, and of our institutions. It is an unauthorized exercise of sovereign power in the hands of this new board of Commissioners, and we think the judgment of the Court appealed from should be affirmed.

MONTGOMERY, J., dissents.

CLARK, J., dissenting. In England the test of navigable rivers is the ebb and flow of the tide. In this country, owing to essential differences in topography, the test of a navigable river (over which class of streams alone Congress has jurisdiction) is that it is wide enough and deep enough to be navigable by sea-going vessels, and below falls or other obstructions so as to be accessible to such vessels. Navigable streams are subject to regulation by State legislation provided it is not repugnant to any regulation thereof by Congress, *Bagg v. Railroad,* 109 N. C., 281; *Morgan v. Louisiana,* 118 U. S., 455; *Smith v. Alabama,* 124 U. S., 465; *Railroad v. Alabama,* 128 U. S., 96; Cooley Const. Lim., 595; 16 Am. and Eng. c.. 264, and this to the extent even of imposing a reasonable toll as compensation for improving the navigation of such streams, if not in conflict with some statute passed by Congress in pursuance of its paramount right. *Thames Bank v. Lovell,* 46 Am. Dec., 332; *Benjamin v. Manistee,* 42 Mich., 628; *McReynolds v. Smallhouse,* 8 Bush. (Ky.), 447; *Morris v. State,* 62 Texas, 728; Prentice & Eagan Commerce Clause 113, and cases cited.

Streams not technically navigable in the above sense are exclusively within State jurisdiction and are those non-navigable and those cut off by falls in the river from access by sea-going vessels. *Com. v. King,* 150 Mass., 221; The Montello, 11 Wall., 411; and streams strictly non-navigable are divided into floatable and non-floatable.

The distinction between floatable and non-floatable streams is drawn in *Commissioners v. Lumber Co.,* 116 N. C., 731, in which it is held that the Catawba River, at the location now in question is a floatable stream, and the Act of the General Assembly, Acts 1897, Ch. 388, recites that decision and provides for the regulation of the use of said stream for floatage purposes. It is the constitutionality of that statute which is called in question by this action.

In *State v. Glenn,* 52 N. C., 321, it is said that "When a stream (not navigable) is naturally of sufficient depth for valuable floatage, the public have an *easement* therein for the purpose of transportation and commercial intercourse, and in fact they are *public highways by water,*" this easement being explained to be as to the use of the stream for said purposes, the bed of the stream and with it the right of fishing being capable of grant to the riparian owners. To same effect *Bucki v. Cone,* 25 Fla., 1.

Floatable streams being "public highways by water" as said in *State v. Glenn, supra,* the State can in the exercise of its powers provide regulations for the unrestricted exercise thereof, and provide for the expense of doing so and of keeping the channel open, either by funds out of the public treasury or by tolls upon the commerce using said streams (*i. e.,* logs and rafts) and this power it can exercise through commissioners appointed directly by the State or confer the control and the power to lay tolls upon the Commissioners of the Counties through which such "public highway by water" flows.

In many instances the State has devolved the duty of keeping open the use of floatable streams upon private companies, giving in consideration thereof the right to exact tolls (as is also done in the case of turnpikes) and such acts have been sustained as a legitimate exercise of legislative power, and that these do not infringe "the right of free navigation." *Osborne v. Knife Falls Co.,* 32 Minn., 412; *Benjamin v. Manistee,* 42 Mich., 628, (opinion by Cooley, J.); *Nelson v. Navigation Co.,* 44 Mich., 7; *Morris v. State,* 62 Texas, 728; *Green v. Palmer,* 83 Ky., 646; *Duluth Lumber Co., v. Boone Co.,* 17 Fed. Rep., 419; *Huse v. Glover,* 119 U. S., 343; *Sands v. Manistee,* 123 U. S., 22. Nor conflict with the constitutional inhibition against taking private property without compensation. Gould on Waters, Section 143, and cases cited. A *fortiori* the State can confer the control of a public highway and the right to lay tolls upon the transportation thereon, upon one of its own agencies, the Commissioners of the Counties through which, or upon whose borders, the stream runs. It is difficult to understand why it is not competent for the Legislature, under its general police power, to permit the organization of a governmental agency to improve the navigation of these streams for logs in the same way and to devote any profit arising from tolls to the special purpose of improving and building such bridges as would not interfere with the passage of logs, instead of putting such profits into the coffers of the County to be used for general County purposes.

This is not a tax or an assessment (as in *Peace v. Raleigh* cited by plaintiffs' counsel), but a toll which is provided for in the Act in question. It is a matter of universal knowledge that the Legislature has resorted to the plan of allowing persons or companies to charge toll for the purpose of keeping up certain public roads in the mountain Counties

in North Carolina.   The charging of these tolls has been at times allowed and at other times discontinued by the Legislature.   It was always in contemplation of the State and those in charge of such roads, that a profit would be realized and pocketed by those who should keep the highways in good condition.   There is no reason why the State should not embark in the same business itself or authorize one of its local agencies to engage in it and to apply its profits for the public good.

Were these charges technically taxes instead of tolls, it has been held that even a tax levied within the constitutional limits for one County purpose may be devoted to another County purpose.   *Long v. Commissioners,* 76 N. C., p. 280.

The Legislature has the power to convert an ordinary public highway used as a carriage and wagon road into a turnpike or toll road.   The Courts hold in such cases that "the change is not in the character of the servitude but in the mode of sustaining the highway, or keeping it in repair, viz: in substituting tolls instead of taxes or involuntary labor."   *Carter v. Clark,* 89 Ind., 238, 239 ; Elliot on Roads and Streets, p. 55, and authorities there cited.   Especially see *Walker v. Caywood,* 31 N. Y., 51 ; *Wright v. Carter,* 27 N. J., 76 ; *Douglass v. Boonesborough,* 23 Md., 219 ; *State v. Blake,* 36 N. J., 442.

Has the Legislature the power to assume the same control over *navigable* and *non-navigable* streams as *over* the *dirt roads* made *such* by authority of law ?

"It is too late to question that the police power of the State (which is part of its general legislative power) extends to providing for every object which may be reasonably considered necessary for the public safety, health, good order or prosperity, and which is not forbidden by some restriction in

the State or Federal Constitution, or by some recognized principle of right or justice found in the common law. It is unnecessary to consider at present the limits of this extensive power, *since it clearly includes the right to provide for and compel the clearing out, not only of such water courses as are naturally navigable, but of all such watercourses and drains as are not and never were navigable,* but which are necessary for carrying off the surplus drain water, thereby promoting the public health, and enabling a considerable portion of territory, otherwise uninhabitable, to be brought into cultivation." *Norfleet v. Cromwell,* 70 N. C., 634; *Brown v. Keener,* 74 N. C.,712, at pp. 716, 717; The Code Sections 3707, 3710, 3711; *State v. Moore,* 104 N. C., at pp 720, 721 and 722; *Sands v. Manistee,* 123 U. S., pp. 294, 295.

The Boards of Commissioners of two or more Counties can be united in such work by legislative authority. *Herring v. Dixon,* 122 N. C., 420.

If a charter were granted to a private company to clean out the channel and in consideration of keeping it open and of building all necessary bridges over the stream, the company were authorized to levy toll on the logs and other traffic, could there be any doubt of the legality of such charter? If not, then certainly the State can exercise the powers it could grant and can confer them upon the County Commissioners of the riparian Counties as agencies of the State.

As to the suggestions in the argument of the possible purposes in passing the Act in question it has always been held that the Courts will not inquire into the motives of legislators of any kind of grade, whether it be the Congress of the United States, the Legislature of the State, or a municipal board, except in so far as they may be disclosed by the language of

the Act itself, and every intendment of law is in favor of the good faith of a legislative body. *State v. Moore,* 104 N. C., p. 714; *Soon Hing v. Crowley,* 113 U. S., pp. 703, 704, 710; *Angle v. Railroad,* 151 U. S., 18. Unless an Act is plainly unconstitutional upon its face, it is the duty of the Courts to sustain and uphold the exercise of the legislative will. *Hoke v. Henderson,* 15 N. C.,1; *Sutton v. Phillips,* 116 N. C., 502; *McDonald v. Morrow,* 119 N. C., 670; *State v. Moore,* 104 N. C., at page 719.

In granting the restraining order against the defendants' proceeding as authorized by the terms of said Act, I think there was error.

DOUGLAS, J., concurring in judgment. This case presents either necessarily or by possible implication many difficult and perplexing questions, rendered more so by their far reaching and perhaps unforeseen results. What is and is not a floatable stream I am at present utterly unable to define, and my inability is not lessened by reading the authorities from other States. The doctrine may be said to be of common law origin, and like nearly all such doctrines is the offspring of necessity. It seems to come to us from some of the Northern States where there are large bodies of timber with intersecting streams, but few local railroads and no efficient system of public roads. The present value of such lands is principally in their timber and its value depends upon the accessibility of market. Under such circumstances the practical use of the smaller streams is confined almost exclusively to floatage, which being of paramount importance, came to be regarded as of paramount right. Having such an origin, the doctrine is naturally affected in different States by their different necessities and local statutes.

How small a stream may be floatable I am not prepared to

say; and I am glad that at least this much difficulty has been solved by the decision of this Court holding that these streams now under consideration are floatable streams. I suppose this is now the law of the case; but it does not settle the case. The term "floatable stream" implies an easement in some one to use the stream for purposes of transportation. Whether this easement belong to the general public or is appurtenant to the riparian lands, it is difficult to say. If it exists at all, it must belong to the riparian owner, as a *natural* easement. Whether it vests in him solely, or in common with others, it is needless now to discuss. If it is worth anything to anybody, it is a valuable appurtenance to his land, of which he can not be deprived without adequate compensation. Whether this compensation must be in money, or may be in the increased conveniences afforded him by valuable improvements upon the stream, need not now be considered; as no compensation whatever appears to have been given to him, and no substantial improvements have been made which would increase the facility of transportation. I speak of the riparian owner as a class, each of whom has the easement, where it exists, as far as the floatability of the stream extends. If he owns the easement, then the State can not charge him for the simple use of it. In the majority of cases the State has granted to him the bed of the stream, and has nothing left therein to *grant* to any one else. I concede the right of the State to establish a highway on water or land, but it can acquire the bed of the highway in private lands only by sale or dedication by the owner, or by condemnation according to law with adequate compensation. Whether the State establishes such a highway directly or through the agency of the Counties or even by a private corporation, may not be material, as in any event it would be a delegated exercise of the right of eminent domain, which is exclusively vested in the

State as an inherent prerogative of sovereignty. The State can not take private property even for a public use without just compensation, and can not take private property solely for the private use of another under any circumstances. Of course it can not authorize any one else to do what it can not do. I also admit that where the State has made or caused to be made valuable improvements of a local nature, it may charge a reasonable compensation for the use of the increased facilities and benefits afforded by such improvements. But this is in the nature of a toll and not a tax, and presupposes some corresponding benefit to him who pays the toll. Where there is an utter failure of consideration, why should the toll be paid? But is said to be in the nature of special tax levied upon the property to be benefitted. But on what property is it levied? Not on the logs, for they have not been benefitted, nor even assisted in their journey. Moreover a tax must possess some element of uniformity; and if levied locally for a special purpose, its disbursement must be confined to its creative objects.

While I do not mean to attack the *general* constitutionality of the Act, I think it is defective in application and affords no constitutional warrant for the assessment under consideration, as no improvement whatever has been made upon the stream, and no pretence of condemnation of whatever private property may have vested therein. I do not think the State can in the utter absence of any general system of taxation, tax directly or indirectly the easement held by the plaintiff. For the reasons stated above, I think the judgment should be affirmed.