VALENTINE, *ex rel.* DUDLEY, *v.* BERRIEN SPRINGS
WATER-POWER CO.

BERRIEN SPRINGS WATER-POWER CO. *v.* HOFFMAN.

1. NAVIGABLE WATERS — DAMS — AUTHORITY OF BOARDS OF SUPERVISORS.

The board of supervisors of a county has ample authority, under section 4, art. 18, of the Constitution, and 1 Comp. Laws, § 2494 *et seq.*, to grant the right to construct a dam across a navigable stream.

2. SAME—RIGHT OF NAVIGATION—LOCKS.

The constitutional inhibition against prejudicing "the right of individuals to the free navigation of the stream" does not mean that every such dam must be provided with a lock for the passage of vessels, but only that the stream, so far as navigable, shall remain a public highway.

3. WATER-POWER COMPANIES—SCOPE OF STATUTE.

Act No. 202, Pub. Acts 1887 (2 Comp. Laws, § 6806 *et seq.*), authorizing the formation of corporations to dam and improve water-courses, and to use, lease, or sell the water power appurtenant thereto, is not, by section 9, subd. 3, limited in its operation to Berrien county, but is sufficiently broad in its terms to authorize corporations to be organized under it in any county in the State.

4. SAME—PURPOSES OF CORPORATION—TRANSMISSION OF ELECTRIC POWER.

Under section 11 of the act, the purposes of such a corporation may legitimately include that of producing and supplying a municipality and its inhabitants with electricity for lighting and other purposes.

5. SAME—NAVIGABLE STREAMS.

The act is not limited in its operation to nonnavigable streams.

6. SAME—DAMS—FEDERAL CONSENT—QUO WARRANTO—ISSUES.

On *quo warranto* by the State to determine the validity of a franchise granted by a board of supervisors to construct a dam across a navigable stream, the right of respondent to build the dam without the consent of the Federal authorities is not in issue.

7. SAME—INCREASING HEIGHT OF DAM—NOTICE.

Where a franchise has been regularly granted to construct a dam 16 feet high, the right to increase its height to 20 feet may be granted without further public notice,—particularly on a showing that options have been secured for the purchase of all flowage rights necessary for a dam of the latter height.

8. SAME—SALE OF FRANCHISES—OPTIONS ON FLOWAGE RIGHTS— IMPLIED WARRANTY—ESTOPPEL—EQUITY JURISDICTION.

A sale by the stockholders of a water-power company of all of their stock therein, together with the corporate franchises and property, including a franchise to dam a given stream, and certain options for the purchase of flowage rights incident thereto, carries with it an implied warranty on the part of the vendors of the validity of such franchise and options, and estops them from afterwards questioning the same; and a bill in equity will lie, at the suit of the corporation, for relief against the action of any of such stockholders, or their confederates, in procuring conveyances and options on their own behalf antagonistic to those previously given to the company.

9. CORPORATIONS—STOCKHOLDERS—ASSIGNABILITY OF INTERESTS.

A subscriber to the articles of association of a corporation becomes at once a stockholder to the amount subscribed, and may assign his rights as such in advance of the issue of certificates for his shares.

Error to Berrien; Peck, J., presiding.    Submitted April 16, 1901.    Decided September 25, 1901.

*Quo warranto* proceedings by George M. Valentine, prosecuting attorney of Berrien county, on the relation of Gus M. Dudley, against the Berrien Springs Water-Power Company, to determine the validity of a franchise to dam a navigable stream.    From a judgment of ouster on demurrer to the plea, respondent brings error.    Reversed.

*Fred A. Baker* (*Fred P. Delafield* and *O'Hara & O'Hara*, of counsel), for appellant.

*M. L. Howell* and *G. M. Valentine*, for appellee.

Appeal from Berrien; Peck, J., presiding.    Submitted April 16, 1901.    Decided September 25, 1901.

Bill by the Berrien Springs Water-Power Company against John U. Hoffman, impleaded with Charles A. Chapin and others, to protect the enjoyment of such franchise. From a decree dismissing the bill on demurrer, complainant appeals. Reversed.

*Fred A. Baker (Fred P. Delafield* and *O'Hara & O'Hara,* of counsel), for complainant.

*Sam H. Kelley* and *M. L. Howell (Lawrence C. Fyfe,* of counsel), for defendant.

LONG, J. On the 3d day of January, 1895, the board of supervisors of the county of Berrien granted the respondent, the Berrien Springs Water-Power Company, a franchise to build a dam across the St. Joseph river at Berrien Springs. The principal case here is an information in the nature of a *quo warranto* to determine the validity of this franchise. The information was filed in the circuit court of that county on April 30, 1900. It alleges a usurpation of the franchise by the respondent, and that "said company claims the right to build, and is about to build, said dam." The first plea of respondent sets forth the action and proceedings of the board of supervisors making the grant exactly as they appear of record on the journal of the board. The dam was to have a height of 16 feet. The second plea sets forth the record of the proceedings of that board supplementary to and amendatory of the original grant, increasing the height of the dam to 20 feet. The relator filed a demurrer to these pleas, containing 26 special causes of demurrer, to the effect that both the original and supplementary grants are illegal and void. The case was heard on the demurrer before Judge Peck of the Jackson circuit, who sustained the demurrer, and entered judgment of ouster. The respondent brings error.

In the case of the Berrien Springs Water-Power Company against John U. Hoffman and others, the bill was filed to protect the complainant in the enjoyment of the

franchise granted by the said board of supervisors. Defendant Hoffman filed a demurrer to this bill. The demurrer raised the question whether the grant by the board of supervisors is legal and valid, and also the question whether, under the facts stated in the bill, the complainant is entitled to any equitable relief against the defendants. The case was heard in the court below on the demurrer with the *quo warranto* proceedings, most of the questions being the same in both cases. In the chancery case the court also sustained the demurrer. The complainant appeals from that decree. The two cases will be discussed together here.

The court below held substantially:

1. That the statute under which the Berrien Springs Water-Power Company was organized does not apply to navigable rivers, and that the St. Joseph river is navigable.

2. That, if the statute be given the scope claimed for it by the complainant, viz., to authorize a corporation organized under it to dam a navigable river, and furnish the water to other persons or companies on such rental as might be agreed upon by and between it and those desiring to obtain the water, the law would be unconstitutional, as it provides no protection and safeguard for those who might thereafter desire to navigate the river, no method of determining the proper charges to be made for water, and no limitations beyond which complainant might not extend its charges.

3. That the board of supervisors did not acquire jurisdiction to grant leave to construct a 20-foot dam, because notice of the application for such construction was not published as the law requires.

4. That no individual or company, even if authorized by the State, could construct the dam until empowered to do so by the United States.

We think the court was in error in sustaining these demurrers. Section 4, art. 18, of the Constitution of this State, provides:

"No navigable stream in this State shall be either bridged or dammed without authority from the board of supervisors of the proper county under the provisions of law. No such law shall prejudice the right of individuals

to the free navigation of such streams, or preclude the State from the further improvement of the navigation of such streams."

The legislature, by Act No. 156, Laws 1851, provided that boards of supervisors should have power, within their respective counties, to permit or prohibit the construction or maintenance of any dam or bridge over or across any navigable stream.   Section 21 of this act was amended at the same session (Act No. 165, Laws 1851), and section 22 was amended by Act No. 129 at the session of 1873. The act, as amended (1 Comp. Laws, § 2494 *et seq.*), will be found in the margin.[1]   It is contended by counsel for the water-power company that the characteristic features of the constitutional provision and of this legislation are:

1. That, under the Constitution, a franchise to dam or bridge a navigable river cannot be granted by the legislature except with the consent and approval of the board of supervisors of the proper county; such consent and approval to be given under such statutory regulations as the legislature may prescribe.

2. That the provision of the Constitution that "no such

[1] SECTION 21. "Every such board of supervisors shall have power, within their respective counties, to permit or prohibit the construction of any dam or bridge over or across any navigable stream.   They shall also have power to provide for the removal of any obstruction arising from the erection of booms or collecting of logs or rafts in such streams by any individual, and to direct the time in which, and places where, persons having logs, rafts, and boats in such streams shall be allowed to remain, and when the same shall be removed; and may impose such penalties as they deem necessary to enforce such regulations, and authorize the sheriffs or their deputies to carry into effect the regulations made under the provisions of this act."   Act No. 165, Laws 1851.

SEC. 22.   "Whenever any person or persons, or any incorporation, shall wish to construct a dam across any such stream as is mentioned in the preceding section, such person or persons or corporation shall present to the board of supervisors, or file with their clerk, to be presented to them at their next meeting, a petition praying for leave to construct such dam, and setting forth the purpose, location, height, and description of such dam, and whether it is proposed to construct a lock or chute or apron, and of what description, for the passage of boats, vessels, rafts, or timber; and, before the same shall be heard and determined by such board, it shall be made to appear to the board that notice of such application, signed by the petitioners, and stating substantially the con-

law shall prejudice the right of individuals to the free navigation of such streams " does not mean that the navigability of the streams may not be obstructed by bridges without draws or dams without locks; that all it means is that no exclusive rights to navigate the streams shall be granted, and that, so far as they are navigable, they shall be public highways, open to use by all the world.

3. That the statutory regulations make no distinction between persons, or between persons and corporations, or between corporations; that the boards of supervisors are given power to grant franchises to bridge or dam any navigable river to any person whosoever or to any corporation whatsoever; that a grant can be made to any corporation, and, if it has no use for the franchise under its corporate powers or business, it may assign and transfer the grant to some person or corporation that has use for it; that private corporations can be organized in Michigan only under general laws, the policy of the State being to give every one an equal right to have and enjoy corporate franchises; that this policy is so clearly expressed in the Constitution, and has been so thoroughly sustained by the Supreme Court of the State, that there is no occasion to cite authorities in its support.

4. That the statutory regulations do make an important distinction between navigable rivers; that, if the stream

---

tents of such petition, has been published in some newspaper printed in each county through which such stream runs, if there be a newspaper published in such county, and also in one newspaper, at least three weeks previous to the hearing of such application, published in the city of Detroit; and on such hearing any person or persons shall be heard in favor of and in opposition to the prayer of the petition; and such board may adjourn such hearing to any other time or place; and they may grant or refuse the prayer of such petition, and the determination shall be entered at length upon the record of said board; and, if such board shall allow the said dam to be constructed, the petitioners shall be at liberty to construct the same by complying fully with the terms and conditions set forth in their petition; and after having obtained such right, and constructed such dam, such petitioners, their heirs, successors, or assignees, may, if such dam be destroyed or decayed, construct a new dam, subject to all the same terms and conditions, on the same site, without again applying to such board: _Provided_, that nothing in this act contained shall be construed as giving to such board of supervisors any power to grant the right to any person or persons or corporation to flow, or in any manner to take or injure, the lands of any person or persons by or in consequence of constructing such dam." Act No. 129, Laws 1873.

SEC. 23. "Whenever any person or persons, township officers, or corporation shall wish to construct any bridge across any stream

is not capable of being navigated with a vessel of 15 tons burden, no public notice or public hearing is necessary when a grant is made by the supervisors to build a bridge across it, either with or without a draw; in other words, that such a stream may have a barrier built across it in the shape of a bridge without any public hearing before the board of supervisors.

In *Shepard* v. *Gates*, 50 Mich. 497 (15 N. W. 879), Mr. Justice CAMPBELL, speaking of this statute and of the constitutional provision in relation to this subject, said:

" The objection that no authority had been given by the board of supervisors to build the bridge would have required attention if it did not appear that this branch of the Au Gres was only used for floating logs, and does not appear to have been adapted, in its natural condition, to any valuable boat or vessel navigation. The clause in the Constitution providing that ' no navigable stream in this State shall be either bridged or dammed without authority from the board of supervisors of the proper county, under the provisions of law,' has been understood as adopted in furtherance of the policy of the Ordinance of 1787, which stipulated that ' the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places be-

at a point where the same is navigable for boats or vessels of fifteen tons burden or more, they shall apply to the board of supervisors by petition, and shall give notice of the same, in like manner, as near as may be, as provided in section twenty-two of this act; and the powers and the mode of proceeding of such board shall be the same, as near as may be, as provided in the last-named section. Every such petition shall set forth the kind and description of the bridge proposed to be constructed, and whether the same is to be constructed with a draw, or whether any, and what, provision is to be made for the passage of vessels or boats; and such board shall have the power to grant or refuse the prayer of such petition upon such terms as they may deem just and reasonable, and to prescribe what description of bridge may be constructed, or to prohibit the construction of any bridge on the proposed location, as in their judgment the public interest shall require." Act No. 156, Laws 1851.

SEC. 24. "Every such board of supervisors shall have power to make general rules and regulations as to the kind of bridges, and the mode of constructing the same, over any such stream as mentioned in section twenty-one of this act, when such stream shall not be navigable for boats or vessels of fifteen tons burden, or to grant permission for building the same, without the notice or hearing above provided, in such manner as shall be judged proper with reference to the passage of boats, rafts, and timber." *Id.*

tween the same, shall be common highways, and forever free,' etc. Ordinance 1787, art. 4. That has been considered as referring to navigation in its proper sense, by some sort of boats used as means of carriage. At the date of the ordinance, the largest portion of the carrying trade in the Northwest was conducted in moderate-sized boats, and the cargoes, and sometimes the boats themselves, were taken across the portages or carrying places dividing one stream or stretch of navigable waters from another. The legislature of 1851 so construed the Constitution by confining the necessity of special leave from the supervisors for constructing bridges to streams navigable by boats or vessels of 15 tons burden or more, while the supervisors were authorized to make general regulation in regard to shallower streams. Act No. 156 of 1851, §§ 23, 24. In the absence of anything appearing to the contrary, we do not think that a bridge which does not interfere with convenient floatage can be regarded as having been built illegally in completing this highway."

The Berrien Springs Water-Power Company was incorporated under Act No. 202, Pub. Acts 1887 (2 Comp. Laws, § 6806 *et seq.*). This act granted the right to organize water-power companies, giving such corporations the right to all the franchises and powers conferred by the act, or by the general provisions of the statutes relating to corporations. The articles of association of the company, in stating the purposes for which it was organized, followed the language of the statute, and set forth :

(*a*) The damming of the St. Joseph river at or near the village of Berrien Springs, in the county of Berrien.

(*b*) The excavating and constructing, maintaining, repairing, and improving of any canal it might wish to excavate and construct.

(*c*) The water power appurtenant thereto.

(*d*) The use and control of the same for the purpose of accumulating, storing, conducting, selling, furnishing, and supplying, upon agreed rental, water and water power.

(*e*) For mining, milling, manufacturing, domestic, municipal, and agricultural purposes.

(*f*) And for the purposes of navigation.

An additional purpose stated is that of producing and

supplying the village of Berrien Springs and its inhab-
itants with electricity for lighting, heating, and motive
purposes.

We think this act is broad enough in its terms to author-
ize corporations to be organized under it in any county of
the State. The third subdivision of section 9 does not
limit the operation of the act to Berrien county, but merely
gives power to any corporation organized under the act to
divert the waters of Lake Paw Paw, or Paw Paw river,
or any tributary stream in Berrien county, into any canal
excavated or constructed under the act. The act in terms
applies to the whole State, and contemplates the organi-
zation of corporations for the improvement of the water-
courses of the State, whether navigable or nonnavigable,
by the construction of dams, the excavation of canals,
and the deepening of channels. Corporations making
such improvements are authorized to use the water power
of the dam by leasing or selling the power, or by using it
themselves; and they are also authorized to do a trans-
portation business upon the navigable water-ways con-
structed and maintained by them. By the sixth subdi-
vision of section 9 of this act such corporations are given
the same power to condemn property to the public use
as is possessed by railroad companies. This is done to
enable such corporations to so improve the water-courses
of the State as to make them navigable and useful public
highways for the use and enjoyment of the people of the
State. By section 11 of the act such corporations are also
given the right to supply water to other persons or com-
panies for mining, manufacturing, milling, domestic,
municipal, or agricultural purposes on such rent as shall
be agreed upon, or to use the same themselves in any class
of manufacturing purposes. We think the additional
purposes stated in the articles of association are fully
authorized by this section of the act.

The right to use such navigable streams is referred to
by this court in *Stofflet* v. *Estes*, 104 Mich. 208 (62 N.
W. 347). It was there said:

"Moreover, the stream being navigable, the local authorities have no right to build a bridge without action by the board of supervisors, who may direct how it should be built. Const. art. 18, § 4; 1 How. Stat. §§ 493, 495, 496. The record indicates that the board has never authorized a bridge at this place, and there is no pretense that the change proposed has been sanctioned. There are many streams in the State which have been made deeper by dams. In ponds so formed, sometimes extending for miles, good-sized boats may float where formerly only logs could float in times of freshets. In such cases, if the stream is navigable for any purpose, the private rights of individuals are protected against arbitrary action by local authorities, who may only act when and in such way as the supervisors permit, and then not in contravention of private rights."

The title and body of the act each provide for dams and excavations for two purposes, viz., for the purpose of obtaining water power, and the purpose of deepening the water-way so as to make it more useful for navigation. It is apparently conceded that a 20-foot dam at Berrien Springs will so deepen the St. Joseph river as to set the water back for a distance of some 10 miles, and thus improve its navigation to that extent. The learned circuit judge, however, was of the opinion that it is not competent to build a dam across a navigable stream unless the dam be provided with a lock so as to permit the passage of vessels. Such a rule cannot be sustained. There is no constitutional prohibition, and the legislature has left the matter of damming such streams to the judgment and discretion of the board of supervisors of each county in the State. It is admitted that St. Joseph river, above Berrien Springs, is navigable only in a qualified sense. It is navigable only as many other rivers of the State are navigable. It has dams built across it in many places above Berrien Springs. Grand river is navigable in the same sense as is the St. Joseph river above Berrien Springs, and yet Grand river is obstructed by numerous dams above Grand Rapids. The future prosperity of many places in the State is largely dependent upon the

128 MICH.—19.

use which may be made of rivers of this character. If dams cannot be built, and water power (the cheapest in the world) thus furnished, water supplied, and the navigation of rivers improved, these cities, villages, and country towns will lose the greatest benefits which nature has placed within their reach.

The act under which the Berrien Springs Water-Power Company was incorporated is not limited to nonnavigable streams. The act construed in *Clay* v. *Improvement Co.*, 34 Mich. 204, was limited to the improvement of the navigation of rivers, and it was held not to apply to streams that are not navigable in any sense of the term. The act construed in *Nelson* v. *Navigation Co.*, 44 Mich. 7 (5 N. W. 998, 38 Am. Rep. 222), and *Attorney General* v. *McArthur*, 38 Mich. 204, was limited in the same way; and so was the act passed upon in *Benjamin* v. *Improvement Co.*, 42 Mich. 628 (4 N. W. 483). It was said in the last-named case, at page 634: "Free navigation, therefore, does not necessarily mean navigation of the streams in their natural condition, unobstructed and unimpeded."

This is a proceeding in behalf of the State to determine the validity of a franchise emanating from the State. It is not a proceeding on behalf of the Federal Government. The State and the prosecuting attorney of Berrien county have no authority to represent the Federal Government; and it must be assumed that, if Congress has any jurisdiction over the St. Joseph river at Berrien Springs, the consent of Congress, or of some officer of the United States duly authorized by it, will be obtained before the dam is built.

We think also that no public notice of the petition to increase the height of the dam from 16 to 20 feet was necessary. The original franchise authorized the construction of a 16-foot dam. This would be just as much an obstruction to the river as a 20-foot dam would be. The public were not interested in the height of the dam. The

act authorizing the board of supervisors to grant such a franchise provides that "nothing in this act contained shall be construed as giving to such board of supervisors any power to grant the right to any person or persons or corporation to flow, or in any manner to take or injure, the lands of any person or persons by or in consequence of constructing such dam." 1 Comp. Laws, § 2495. It appears that the petition for an increase in the height of the dam states, and the second plea of the respondent alleges, that "options for the purchase of flowage rights for a 20-foot dam have been secured from all lands affected thereby." This obviated the necessity for the publication of notice.

The court was in error in sustaining the demurrer to the pleas. The order below must be reversed, the demurrer overruled, and the judgment of ouster reversed, and judgment entered here in favor of respondent.

The demurrer in the chancery case raised the question whether the grant by the board of supervisors is legal and valid. That question has been disposed of. It also raised the question whether, upon the facts stated in the bill, the complainant is entitled to any equitable relief against the defendants in that bill. It appears by the bill that the Berrien Springs Water-Power Company was organized by 29 residents of Berrien Springs, each of whom subscribed for $1,000 of the capital stock of the company; that the articles of association fixed the capital stock at $50,000, divided into 500 shares of $100 each; that, after obtaining the grant from the board of supervisors, the corporation proceeded to acquire the right to overflow the lands bordering on the St. Joseph river above Berrien Springs; that it obtained conveyances of the right of flowage over 7 different parcels of land, and obtained options for the purchase of rights of flowage over 30 other parcels of land; that these conveyances and options cover nearly all of the lands that would be overflowed by the construction of the proposed dam; that thereupon all of

the original stockholders transferred their interests to one
James Du Shane and certain others.    The bill then states
substantially:

1. The by-laws of the Berrien Springs Water-Power
Company contained a provision that all the power devel-
oped by the dam and canal contemplated by the company
should be employed and utilized in the village of Berrien
Springs and in the township of Oronoko, in which the
village is situated.  Before the original stockholders of
the company sold out their interests and transferred the
same to James Du Shane and his associates, to wit, on
May 12, 1898, they adopted an amendment to the by-laws
striking this provision out of them.  The object of this
amendment was to permit the corporation to transmit
electric power to points outside of Berrien Springs, and to
the city of South Bend, an important manufacturing city
in the State of Indiana, and to other towns and places in
the State of Michigan and the State of Indiana.

2. Charles A. Chapin is a capitalist residing in Chicago.
He is the principal owner of the South Bend Electric
Company, a corporation engaged in furnishing electric
light and power to the city of South Bend and vicinity.
If the Berrien Springs Water-Power Company transmitted
electric power to South Bend and vicinity, it would com-
pete with Mr. Chapin's company, and for that reason he
was interested in defeating the construction of a dam at
Berrien Springs; and, if the dam was constructed, he was
interested to have the ownership and control of it, if pos-
sible.

3. Almon B. Ayers, Isaac N. Savage, and Fred Mc-
Omber were among the original stockholders of the Ber-
rien Springs Water-Power Company.  Mr. Ayers and
Mr. McOmber were members of its board of directors,
and Mr. Savage was its secretary, prior to the time when
all of the original stockholders sold out their interests.
In addition to this, Mr. Ayers had given the corporation
an option for the purchase by it of the right to overflow
about 75 acres of land at or near Berrien Springs for the
agreed consideration of $5,600.

4. Notwithstanding the sale in which Ayers, Savage,
and McOmber participated, and the obligations created by
their relations to said sale as vendors, they entered into a
conspiracy with Charles A. Chapin to defeat the enter-
prise and improvement for which the Berrien Springs
Water-Power Company had been incorporated and sold.

As a part of the same transaction, Ayers had agreed to extend his option, the same having expired November 11, 1899; the consideration for such extension being an increase in the purchase price of $200. Du Shane and his associates relied upon this agreement of Ayers when they bought out the original stockholders. A new option was prepared for him to execute, and he took it away with him to obtain the approval of his attorney to the form of it. He never returned it to the company, or to any one connected with it. On the contrary, he executed to Charles A. Chapin, or to John U. Hoffman, of Chicago, as a friend and trustee of said Chapin, an option or deed covering the right of flowage he had agreed to convey to the Berrien Springs Water-Power Company. John U. Hoffman is made a party defendant in the bill because he holds the title to the flowage rights Ayers had conveyed, or had agreed to convey, to Chapin. Hoffman acted simply as a trustee for Chapin.

5. Other parties who had given options to the Berrien Springs Water-Power Company were also approached on the theory that they were still dealing with the Berrien Springs Water-Power Company, and conveyances and options were obtained from them for the purpose of defeating the enterprise of the Berrien Springs Water-Power Company. These conflicting conveyances and options were obtained by Isaac N. Savage, Charles A. Chapin, Hugh H. Hosford, and Almon B. Ayers, and the conveyances were made to them, or to one of them, or to John U. Hoffman, as the friend and trustee of Chapin.

6. Other misconduct on the part of Savage, Ayers, Hosford, McOmber, and Chapin, to which Hoffman does not appear to have been a party, is alleged in the eighteenth paragraph of the bill.

The question presented by this appeal is whether the Berrien Springs Water-Power Company has any rights in the premises which a court of equity can protect against John U. Hoffman.

The prayer of the bill is in part as follows:

"1. That said Almon B. Ayers may be decreed and required to execute to your orator an option for the sale and conveyance from him to it, for the sum of $5,800, of the right to overflow his lands bordering on the St. Joseph river, as described in this bill.

"2. That the options, deeds, and conveyances obtained by said defendants, or any of them, or in the name of any other person for them, or either of them, may be declared null and void as against your orator, and that said defendants, and each of them, may be required and decreed to execute to your orator assignments, deeds, or conveyances transferring to your orator all rights of flowage so acquired by them, or either of them."

The court was in error in sustaining the demurrer to this bill. We have seen that the franchise was properly granted to the corporation by the board of supervisors, and that under the act of incorporation the parties had the right to proceed to acquire flowage rights. The sale by the original stockholders of the company of all their stock therein, together with the corporate franchises and property, including the franchise granted by the board of supervisors and the options for flowage rights, carried with it an implied warranty on the part of the vendors that they had title to the stock, and that the corporate franchise, and the franchise to dam the St. Joseph river at Berrien Springs, were legal and valid, and that the options for the purchase of flowage rights were subsisting obligations; and we think the complainant is entitled to equitable relief against John U. Hoffman.

It cannot be said that the subscription contracts of the original stockholders are not assignable. When a person signs articles of association of a corporation, the subscription itself constitutes the subscriber a stockholder, and he becomes liable to pay the amount, and the corporation becomes obligated to issue the stock to him upon payment of the amount. It is a mutual contract, and such rights are assignable. 1 Mor. Priv. Corp. (2d Ed.) § 56.

The order of the court below sustaining the demurrer must be vacated, and the demurrer overruled. Defendants must be given 20 days in which to answer the bill. Complainant will recover costs of this court.

HOOKER, MOORE, and GRANT, JJ., concurred. MONTGOMERY, C. J., did not sit.