PEOPLE, *ex rel.* BIRD, *v.* GRAND RAPIDS-MUSKEGON
POWER CO.

1. Boundaries—Navigable Waters—Riparian Rights.
  The owner of land bordering on a stream, whether navigable
  or not, owns the bed of the stream to the thread thereof.

2. Navigable Waters—Riparian Rights.
  Such public rights as exist in navigable streams are simply
  easements or privileges, and the adjacent owner may do as
  he pleases with the land under the water so long as he does
  not interfere with the public enjoyment.

3. Same—Navigability.
  A stream is navigable when it is inherently capable of being
  used for the purposes of commerce, for the floating of vessels,
  boats, rafts, or logs.

4. Same—Boards of Supervisors—Dams—Power to Permit.
  By section 4, Art. 18, Const. of 1850, and 1 Comp. Laws, §§ 2494,
  2495, the public right of navigation in streams was intended
  to be protected; and the power given by the statute to super-
  visors of the several counties, relating to the privilege of
  damming streams by private parties, is thereby limited to the
  intended purpose.

5. Same—Dams—Obstructions to Navigation.
  Under the statute, the boards of supervisors are given merely
  power to grant or refuse the petition of private parties, to
  dam navigable streams; and may not impose limitations on
  the right of the petitioner, except by limiting the time in
  which the work may be done.

6. Same—Forfeiture of Franchise.
  And where the petition prayed for the privilege of construct-
  ing three dams, in a navigable stream, and the privilege or
  franchise granted by the board of supervisors required that
  all three dams be constructed in a specified time, or the
  rights of the petitioner should be forfeited, the limitation
  was ineffective to permit a forfeiture of the petitioner's
  right in one of the three dams which he constructed within
  the period allowed.

7. Same—Petition—Amendment.
  After obtaining the privilege asked, petitioner filed a second

petition praying that the original resolution, set out in full, be amended so as to permit a change in the dimensions of the log chutes, in the dams. Without making other changes, the board of supervisors passed the original resolution as so amended. *Held*, that the action of the board merely constituted an amendment to the privilege already granted, and the fact that the petitioner included the forfeiture clause in the resolution recited in the second petition, did not constitute that clause a part of the petition.

Quo warranto in the Supreme Court by the people of the State of Michigan on the relation of John E. Bird, attorney general, against the Grand Rapids-Muskegon Power Company, to test the right of respondent to maintain a dam in the Muskegon river. Submitted June 22, 1910. (Docket No. 129.) Decided December 30, 1910.

*Franz C. Kuhn*, Attorney General, *George S. Law*, Assistant Attorney General, and *Joseph Barton*, Prosecuting Attorney, for relator.

*Bundy, Travis & Merrick*, for respondent.

In October, in the year 1902, the board of supervisors of Mecosta county had before it, and considered, a request preferred by one David D. Erwin for permission to erect in said county three dams across the Muskegon river, one on the North ½ of section 6, in town 13 North, of range 10 West, 25 feet in height, one on the S. E. ¼ of section 20, in town 14 North, of range 10 West, 25 feet in height, and one on section 11 in the town last described, 35 feet in height. The description of land upon which each end of each dam should rest is stated, the material to be employed in construction is stated, and it is also stated that in each dam there would be constructed fish chutes or ladders and a log chute, of given dimensions, in the middle of the channel of the said river. The purpose of building the dam was stated to be "generating electricity to be used as a motive power for manufacturing purposes and operating electric railways, lighting plants, and for

all other purposes to which electricity may be properly applied." By resolution of the said board the permission asked for was given, the location of each of said dams and the material and method of construction being set out therein, as in the said application. The resolution contained, also, in the concluding paragraph, the following:

" That work shall be commenced on at least one of said dams within two years from April 1st, 1903, on the second dam within four years from April 1st, 1903, and on the third dam within five years from April 1st, 1903, and that all of said dams shall be completed on or before six years from April 1st, 1903, in default thereof the rights and privileges hereby created shall cease and become void and of no further effect, unless the time for such commencement and completion shall be extended by the board of supervisors of this county."

Because the dimensions of the log chutes were regarded as too large, an amended application was presented to the board in June, 1904, by Mr. Erwin, in other respects like the one first presented, and containing, further, the words above quoted from the first resolution of the board. This request was granted by resolution of the board in form like the first resolution. One dam only, known as the "Rodgers Bridge Dam," was constructed. It was begun in 1905, completed in 1906, and cost about $250,000. About 3,000 horse power, on the average, is developed. The respondent, a foreign corporation regularly admitted to do business in the State, succeeded, by purchase and assignment, to all the rights of said Erwin. The dam which was built, and the appurtenances thereto, are wholly on land owned by respondent, and it also owns all lands flowed by said dam. The water power created is used in connection with that developed by other dams and by steam plants to generate electricity which is sold as power and light to the public. No extension of time to build the other dams, or either of them, was asked for or given. There is evident no purpose to build them, or either of them. In April, 1909, the board of supervisors, by a resolution in which is recited the history of the orig-

inal action of the board and the alleged default of Erwin and of respondent in not beginning and in not completing two of the dams on or before April 1, 1909, declared all rights under the said original action of the board forfeited. Of this action Erwin and respondent were notified.

It is charged in the information of the attorney general that respondent is unlawfully exercising the right, franchise, and privilege—

"Of maintaining a certain stone and concrete dam thirty-eight feet in height in and across the Muskegon river, a navigable stream, in the township of Mecosta, county of Mecosta, in said State, said dam being erected on section eleven, in township fourteen north, range ten west, the west end of said dam being built upon lot eleven and the east end of said dam on lot five of said section eleven; and of operating the said dam for the purpose of producing water power to be used in generating electricity for furnishing electricity and electrical light, heat, and power."

The court is asked to enter a judgment "excluding it from such franchises and privileges." There is a plea, which was replied to by the attorney general, and pursuant to a stipulation some testimony was taken by a commissioner. The river in its natural state is not in fact navigable except for floating forest products and small boats. The corporate existence of respondent is not attacked, nor its right to exercise its corporate franchises and to do business within the State. The proper construction of the dam which was built is not disputed. No interference, in fact, with any right of the public in the stream is suggested. It is the contention of the attorney general that Erwin secured by the action of the board of supervisors which has been described a franchise granted by the State through the agency of the board; that it was single and indivisible, and that the failure to construct any of the dams is reason for declaring forfeited all rights based upon the said action of the board. This presents the question to be decided. It is, however, urged by the respondent that the large private and semi-public interests

which will be disturbed by a judgment of ouster, interests arising partly out of a wide distribution of bonds having for their security the property in question, requires that the court should decline to enforce the remedy proposed.

OSTRANDER, J. (*after stating the facts*). It is the rule in this State, sustained by an unbroken line of decisions, that one who owns land bordering a stream, whether navigable or not, owns the bed of the stream to the center or the thread thereof. Such ownership is private; such public rights as exist are simply easements, or privileges, and, as a general proposition, it is settled that the owner may do what he pleases with the land under the water so long as he does not interfere with the public enjoyment. In the opinion of this court in *City of Grand Rapids* v. *Powers*, 89 Mich. 94 (50 N. W. 661, 14 L. R. A. 498, 28 Am. St. Rep. 276), will be found references to most of the decisions of this court upon this subject to that time. It is unnecessary to refer to them here. This rule of the State is the rule of the Federal courts with respect to waters within this State. *Grand Rapids, etc., R. Co.* v. *Butler*, 159 U. S. 87 (15 Sup. Ct. 991); *United States* v. *Water Power Co.*, 209 U. S. 447 (28 Sup. Ct. 579). In *Moore* v. *Sanborne*, 2 Mich. 519 (59 Am. Dec. 209), this court follows and approves the rule stated in *Brown* v. *Chadbourne*, 31 Me. 9 (50 Am. Dec. 641), that the true test of navigability—

"To be applied in such cases is, whether a stream is inherently and in its nature, capable of being used for the purposes of commerce, for the floating of vessels, boats, rafts, or logs. When a stream possesses such a character, then the easement exists, leaving to the owners of the bed all other modes of use not inconsistent with it."

The constitutional provision in force when authority to erect the dams was given reads:

"No navigable stream in this State shall be either bridged or dammed without authority from the board of supervisors of the proper county under the provisions of

law. No such law shall prejudice the right of individuals to the free navigation of such streams, or preclude the State from the further improvement of the navigation of such streams." Const. of 1850 [Sec. 14, Art. 8, Const. of 1909], Art. 18, § 4.

It was said in *Shepard* v. *Gates*, 50 Mich. 495, 497 (15 N. W. 878, 879):

"The clause in the Constitution providing that 'no navigable stream in this State shall be either bridged or dammed without authority from the board of supervisors of the proper county, under the provisions of law,' has been understood as adopted in furtherance of the policy of the Ordinance of 1787, which stipulated that 'the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free.'"

The legislation in force when such authority was given is found in 1 Comp. Laws, §§ 2494, 2495. In terms, power is given to boards of supervisors to permit or prohibit the construction of any dam over or across any navigable stream. It is required that a petition for leave to construct a dam across any such stream shall be presented to the supervisors which shall set forth certain matters and the board is empowered to "grant or refuse the prayer of such petition." If they—

"Allow the said dam to be constructed, the petitioners shall be at liberty to construct the same by complying fully with the terms and conditions set forth in their petition; and after having obtained such right, and constructed such dam, such petitioners, their heirs, successors, or assignees, may, if such dam be destroyed, or decayed, construct a new dam, subject to all the same terms and conditions, on the same site, without again applying to such board."

The matters which are required to be stated in the petition are the purpose, location, height, and description of such dam, and whether it is proposed to construct a lock, or chute, or apron, and of what description, for the passage of boats, vessels, rafts, or timber. Reading these provisions together, and considering also the rule of private

property in the bed of streams, they amount to a legislative construction of the Constitution in harmony with the idea that what was intended to be preserved and conserved was the public right of navigation in the streams of the State. It is therefore apparent that the power of boards of supervisors in the premises is limited both by the purpose for which the power is delegated and by the legislation which the Constitution itself makes necessary. They do not act as agents for the county, but as agents of the general public. And if it is assumed that, in view of the constitutional provision, the legislature has not the power to determine the circumstances and conditions according to which the supervisors shall give or withhold assent to the building of dams, it must still be admitted that the circumstances and conditions to be considered by the supervisors in each case are such as relate to the public easement in the stream which it is desired to dam. In fact, as an examination of the statute will disclose, and as is in keeping with the public interest involved, the powers conferred upon supervisors with respect to bridges are very different from those conferred with respect to dams. It is only with respect to streams actually or strictly navigable that permission to bridge is required at all. As to other streams, although navigable for certain purposes, as for floatage, the power conferred is one to make general rules and regulations as to the kind of bridges and the mode of constructing the same. See *Shepard* v. *Gates, supra; Stofflet* v. *Estes*, 104 Mich. 208 (62 N. W. 347). As to dams, as has been stated, the petition for leave to construct must set out certain facts, and the supervisors, and they are by the act given no other power, "may grant or refuse the prayer of such petition."

It is not pretended that each of the structures described in the petition which was presented to the supervisors of Mecosta county was not calculated to preserve and conserve all public rights in the stream. It is not claimed that the single dam which was erected interferes in any way, in fact, with the public easement, or with such use

of the stream by the public, for navigation or otherwise, as the nature of the stream will permit. It is not claimed that with respect to preserving or safeguarding any public interest one of the proposed dams bore to any other of them the relation of a part to a whole; that the scheme or plan considered by the supervisors was a single one consisting of three dams. In this respect the case is unlike the one of *People* v. *Improvement Co.*, 103 Ill. 491, cited by the attorney general. Without attempting here to set out the facts of the case, it is sufficient to say that the essence of the decision rendered, the theory according to which the court acted in sustaining the demurrer to respondent's plea, is expressed in the opinion of the court at page 510 of *People* v. *Improvement Co., supra,* where it is said:

"Had there been but the omission of some duty of minor importance, the alternative of a fine might properly be considered; but the nonperformance here is of a thing which is of the essence of the contract—it goes to the object of the incorporation, not doing the very thing the performance of which was the purpose and object for which the company was instituted. It is failure by the corporation to act up to the end of its creation. The demand of public good is nothing less than that there should be a resumption by the State of the corporate franchise of which there has been such misuser—that the company should be made to give way, so as to afford opportunity, through some other instrumentality, for the accomplishment of this work of public advantage, the improvement of the navigation of these two rivers, or at least of the Kankakee, to the Indiana State line."

There is no reason to believe that authority would not have been given to erect any one of the dams if the petitioner so desired. Forfeiture cannot therefore be justified upon the authority of cases which hold that when a franchise is granted to build a railroad, a waterworks plant, or to make any single, indivisible, public improvement, and there is a failure to complete the work, the franchise may be reclaimed by the State. If we construe the grant, condition, and all as made with reference to the

private rights of the petitioner and the public easement in the stream, we must find it to be either a divisible grant, a grant of three distinct privileges in one resolution, or else it must be held that the condition providing for forfeiture was one which the board had no power to impose. From the standpoint of the public right of navigation in the particular stream, at the particular time, the conservation of that right was three times involved. That is to say, three dams would interfere with it, if at all, three times as much as one dam. And when it was determined that they were warranted in permitting such dams at such locations to be constructed, and that they should exercise the power which they held in trust for the public favorably to the petitioner, the supervisors had exhausted their power unless there remained the power to limit the time within which each of the privileges should be exercised. If this is not so, if their authority in the premises is not to be exercised within the limits set by the public interest to be served and the express language of the statute, what limit can be stated to their power to attach conditions to a grant of authority in such cases?

The attorney general directs attention to the fact that the second petition of Erwin contains the forfeiture clause which is relied upon, the implication being that the supervisors at last granted the prayer of the petition, which is what the statute indicates they shall do, if favorably inclined. I think the fact is of no significance as affecting the question of right. The second resolution of the board in the preamble states that Erwin has applied to have the former "grant of the right to construct certain dams * * * amended as in said petition specified." The amended application asks that the grant of the right theretofore made "be so amended as to read as follows," setting out the resolution of the board already of record with a slight change as to the dimensions of log chutes. And in the second resolution no change is made in the time for beginning work upon the dams, although more

than a year of the time had then expired and two years had elapsed since the passing of the first resolution. The action of the board amounted to an amendment merely of a privilege already granted.

It must be admitted that the language employed in the condition supports the construction which is placed upon it by the attorney general. As mere matter of construction, it would be difficult to sustain the contention that a forfeiture of all rights granted by the resolution was not contemplated if any breach of the condition occurred. According to its terms, the privilege or privileges ceased and became void if work was not begun on one dam—not specified—before April 1, 1905, or if it was not begun on another dam—not specified—before April 1, 1907, or if not begun on the third dam before April 1, 1908, and if the three dams were not completed on or before April 1, 1909. Such a penalty bears no reasonable relation to the purpose to be served in requiring the authority of the board, even if it had the power to impose a penalty, and no court ought to impose it unless the public interest clearly demanded its enforcement. If the grantee of the privilege proceeded in exact accordance with the terms of the condition, he increased thereby the disastrous consequences of failure. But, as has been stated, the board of supervisors had no authority to impose the forfeiture, and the grant must stand without the limitations created by the condition attached unless it is held to have the effect only of limiting the time within which each privilege must be exercised.

There are some considerations tending to show that the apparently unconscionable character of the condition is only apparent, and not real. These considerations will be mentioned, although their statement involves repeating to some extent what has already been said. The situation disclosed must not be confused with one where the public, as the United States, owns the land bordering upon and under the stream, having, in the land and the stream, all the rights possessed in this State by the public and by the private owner. Nor is it a case where the franchise or

privilege in question is a corporate franchise. Whether what is granted by a board of supervisors to one who is given authority to build a dam is called "a franchise emanating from the State," as it was denominated in *Valentine* v. *Water-Power Co.*, 128 Mich. 280, 290 (87 N. W. 370), or whether it is called a permission or privilege, it is a peculiar thing. The public interest in the matter, so far as any such interest was contemplated by the Constitution of 1850, arose out of the public easement to navigate the stream. With respect to this easement, it could never be matter of public concern that a man should build three dams in a stream instead of one, unless the purpose was to improve instead of to interfere with navigation, which is not the case here. Having the right to build three dams in a stream, and building but one, the grantee offends against no public right if he declines to build two of them. From the viewpoint of the Constitution of 1850 and the statute, the private privilege to dam is against the public privilege to navigate the stream, the preservation of which public privilege gave rise to the necessity for withholding the private right in proper cases. It is therefore difficult to see a reason for attaching to the privilege to build one dam the condition that two other unrelated dams should be built.

Again, the franchise or privilege to build a dam, when once granted, is exercised when the dam is constructed. There can be neither misuser nor nonuser of the privilege derived from the supervisors if the dam is constructed as contemplated. And in asking for and receiving a grant of such a privilege, or franchise, no duty rests upon the petitioner to exercise the privilege. There were no contract relations created between Mr. Erwin and the supervisors. Nor, as has been pointed out, could the supervisors contract with him to build three or any number of dams. The privilege granted was no doubt a beneficial thing to the grantee, but in the discharge of their duty in the premises the supervisors, in approving the location and construction of each dam, preserved to

the public its entire beneficial interest. On the other hand, there is reason for a condition fixing a time within which the grantee of the privilege should proceed to exercise it.

The consequences of a judgment of ouster will be a forfeiture of respondent's right to defend the lawful character of its dam, with whatever results may flow from that. Such a judgment must be rested upon the ground that respondent, in accepting the privilege to build the dam, accepted it upon a condition which the granting power had no authority to impose and which secures in its enforcement no public benefit or advantage. There is made out neither nonuser nor misuser of any franchise or privilege granted by the public.

The duty of the court to enter a judgment for the respondent is clear. It is so ordered. Respondent will recover costs.

HOOKER, MCALVAY, and STONE, JJ., concurred with OSTRANDER, J. BLAIR, J., concurred in the result.