DAVID M. BENJAMIN, RELATOR v. MANISTEE RIVER IMPROVE- MENT COMPANY.

*River improvement companies—Tolls for use of navigable streams— " Channel"—Free navigation.*

The navigable waters of the United States, though forever free, are nevertheless subject to State control and regulation and may be improved by the States or bridged or dammed under their legislation.

"Free navigation" is not necessarily the unobstructed navigation of a stream in its natural condition.

The policy of Michigan is against the improvement of highways for trade and commerce by taxation of the people.

Tolls for the navigation of an improved stream are not taxes, duties or imposts on the use of the stream, but are tolls for the enjoyment of improvements by which it has acquired a new value and increased navigability.

Comp. L., ch. 85, in authorizing corporations formed for improving the navigation of rivers, to charge tolls for the use of the improved stream, is not in violation of the provisions of the Ordinance of 1787 or of the State Constitution, securing free navigation.

In proceedings by quo warranto against a corporation authorized by law to deepen the channel of a river, it pleaded that it had removed obstructions by cutting channels through jams, and by confining the water at various points. *Held* on demurrer that it could not be said as matter of law that this was not an exercise of the power given to deepen the channel.

The channel of a stream is the bed over which its waters run, or the passage way between banks through which they flow.

Fixing the amount of tolls is not a judicial act, but is only prescribing in advance a law for the government of those who may be brought within its provisions; and a hearing for the purpose of fixing tolls is not a judicial hearing of which all parties that may be interested are entitled to receive notice.

Comp. L., § 2730, requires a river improvement corporation to file with the Board of Control an annual affidavit of a director as to the probable amount of traffic through the improved portions· of the river during the year, and that he had made due inquiry from lumbermen and otherwise; but it does not give the affidavit any peculiar force as evidence and leaves the board to choose its own methods of getting information, and the Board can .avail itself of the personal observation of its members if it sees fit to do so.

Administrative questions are not in their nature judicial and are not subject to review.

The Board of Control of St. Mary's Falls Ship Canal has exclusive and discretionary authority under Comp. L., ch. 85, to determine the plan of river improvements, and on evidence satisfactory to itself decide when tolls may be properly levied, and grade and change them thereafter.

Quo warranto. Submitted Jan. 21. Decided Feb. 11.

Attorney General *Otto .Kirchner* and *Hughes, O'Brien & Smiley* for the relator. The Ordinance of 1787 secures the free navigation of navigable streams, *Hogg v. Zanesville Canal Manuf'g Co.*, 5 Ohio, 410; Cooley's Const. Lim., 25 *n;* the respondent to an information in quo warranto has the burden of showing that he has complied with the law, *Larke v. Crawford*, 28 Mich., 88; High Ext. Leg. Rem., § 712; the statute providing for the improvement of rivers is void in not providing for evidence on which to determine its necessity, *Butler v. Supervisors*, 26 Mich., 22; *Hibbard v. People*, 4 Mich., 125; *Campau v. Detroit*, 14 Mich., 276; *People v. Brighton*, 20 Mich., 57; *Ehlers v. Stoeckle*, 37 Mich., 261; *Thomas v. Gain*, 35 Mich., 155; Wade on Notice, 505.

*B. M. Cutcheon, Benton Hanchett* and *G. M. Stark* for defendant. Each state can provide for the improvement of streams within its' boundaries so long as there

is no federal legislation, *Gilman v. Philadelphia*, 3 Wal.,
713; *Crandall v. Nevada*, 6 id., 41; *Cooley v. Wardens*,
12 How., 316; *Veazie v. Moor*, 14 How., 568; *Moor v.
Veazie*, 31 Me., 360; *Withers v. Buckley*, 20 How., 93;
*Kellogg v. Union County*, 12 Conn., 7; *Thames Bank v.
Lovell*, 18 Conn., 500; *Ill. River Packet Co. v. Peoria
Bridge Association*, 38 Ill., 467; *Chicago v. McGinn*, 51
Ill., 266; *Depew v. Trustees*, 5 Ind., 8; state legislation
may authorize corporations to improve navigable streams
and collect tolls for the use of the improvements, *La
Plaisance Bay Harbor Co. v. Monroe*, Walk. Ch., 155;
*Hutchinson v. Thompson*, 9 Ohio, 52; the Ordinance of
1787 ceased to be of binding force upon the States of
the Northwest Territory when they were admitted to the
Union, *Pollard v. Hogan*, 3 How., 212; *Permoli v. First
Municipality*, id., 589; *Strader v. Graham*, 10 id., 82;
*Dred Scott v. Sandford*, 19 id., 490.

COOLEY, J.   The purpose of the information in this
case is to test the right of the respondent to exercise
the franchise of taking tolls from persons using certain
portions of the Manistee river in running, rafting or
floating logs or timber down said river.

The information is general, and charges usurpation
of the franchise in question.   The respondent filed a
plea setting up the following facts:

That the respondent is a corporation, organized under
and in pursuance of an act of the Legislature of the
State, entitled "An act to authorize the formation of
corporations for the purpose of improving the navigation
of rivers," approved April 5, 1869 [Comp. L., ch. 85];
the incorporation having been perfected April 4, 1870,
by proceedings which are set forth at length.

That after its organization respondent prepared a map
of the section of the Manistee river, the navigation of
which respondent proposed to improve, and a plan for
the improvement of the same, which showed and set
forth the several points in said stream where improve-
ments were proposed to be made by respondent, and pre-

sented the same to the then Governor and Attorney General of the State, and said improvement was in writing assented to by them.   That afterwards, on July 6, 1870, respondent submitted the map and plan to the Board of Control of the St. Mary's Ship Canal, at a meeting of said board. then held, whereupon said board examined the map and plan, and were then and there of opinion that the construction of the proposed improvement would be a public benefit, and that respondent was a proper company to make such improvement, and did approve of said map' and plan, and did assent to the construction of said proposed improvement, and endorsed upon the map and plan their approval thereof and their assent to the proposed improvement, and then and there fixed the time within which the improvement should be completed to be on or before December 31, 1874.

That said proposed improvement consisted in deepening the channel of the Manistee river by removing obstructions from the river by cutting channels through twenty-two several places in said river, designated as jams and numbered consecutively on said plan from one to twenty-two, both inclusive, by confining the waters of. the river within the channel at the points designated on the plan, and in constructing two dams upon said river at places designated.

That afterwards the Board of Control on good cause shown from time to time extended the time for the completion of said improvement to the 31st day of December, 1882, the first extension of the time being made September 16, 1873.

That the Board of Control afterwards consented to the alteration of the plan so as to dispense with one of the proposed dams.

That in the years 1870 to 1876 inclusive, the respondent completed the improvement with the exception of the construction of the dam, beginning at the point lowest down the river and advancing up stream, and completing the work as it went forward.

That a portion of the work was completed to the sat-

isfaction of the Board of Control in the year 1871, and was in the opinion of said board useful, and the said board was of opinion that tolls should be paid for the use of such portion, and thereupon on February 26, 1872, the board fixed and determined the tolls to be paid for the use thereof upon the logs which should be put into and run upon such portion of said stream. Other portions of said work were also completed in like manner subsequently and from year to year, until the entire of said improvement except the dam had been completed, and the portion of said work so completed from time to time was completed to the satisfaction of the board, and was in the opinion of the board useful, and in their opinion tolls ought to be paid for the use thereof, and tolls were from year to year, and in each of the years from 1872 to 1878, fixed by said Board of Control for said years for that portion of the work completed to such times respectively upon the logs put in and run upon such portion, and such tolls have been accordingly and in pursuance of such action of said board collected by respondent. And said improvement completed as aforesaid was on the 26th day of February, 1879, adjudged and determined by said board to be completed and the same was by said board accepted, and the said board also then determined that in the opinion of the board such improvement is useful, and that tolls should be paid for the use thereof, and afterwards and on April 11, 1879, the said board fixed the tolls which should be paid for the use of such improvement for the ensuing year upon logs put into and run upon that portion of said river which was improved as aforesaid; whereby said respondent has the right to collect such tolls.

To this plea a general demurrer was interposed, and in support of this it is insisted, *first*, that the statute under which the respondent claims to be incorporated is invalid; and *second*, that if valid, the plea shows no such compliance with its provisions by the respondent as authorizes the imposition of tolls.

I. The first objection to the statute is that it is in conflict with that article of compact in the Ordinance of 1787 which provides that "the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said Territory, as to the citizens of the United States, and those of any other states that may be admitted into the Confederacy, without any tax, impost, or duty therefor." These articles were expressly declared to be perpetual, and the Constitution of the State recognizes the right secured, in the provision that "no navigable stream in this State shall be either bridged or dammed without authority from the board of supervisors of the proper county, under the provisions of law. No such law shall prejudice the right of individuals to the free navigation of such streams, or preclude the State from the further improvement of the navigation of such streams." Const. Art. 18, § 4.

It is conceded that a legislative act in violation of the true intent of the constitutional provision would be invalid. It is also conceded that the article copied from the Ordinance of 1787 was intended to give permanent and inviolable rights, and that whether superseded by the Constitution of the State or left according to the terms of the Ordinance as a "perpetual compact," is not matter of importance in this case, since either by the Ordinance or by the Constitution the use of the navigable streams of the State is free to all the people. The important question is what is meant by free navigation, and whether the taking of tolls for the use of improvements is a violation of the compact or of the Constitution in the true intent and meaning of either.

It cannot be seriously contended that the intent of the Ordinance of 1787 was that the navigable streams of the Northwest Territory should remain forever unimproved in order that they might be freely navigated in their natural condition and not otherwise. Such a con-

struction would make the compact a curse rather than a blessing, and while preserving the natural highways would perpetuate a state of things which must eventuate at length in their use being superseded by improved conveniences. But as the compact was made for the perpetual advantage of the people, we must suppose that there was no purpose to limit this advantage to a minimum, or to preclude either the territorial legislature or the new states which should come into the Union from increasing the benefits of the compact by improving the highways the ordinance secured, so as to make them accomplish their purposes as avenues of trade and commerce for all time. In other words, the navigable waters of the territory were placed on the same footing with the navigable waters of the United States, the use of which is forever free, but which are nevertheless subject to State control and regulation, and may be improved by the states, or bridged or dammed under their legislation whenever the convenience of trade, traffic and travel in all its infinite forms shall seem to require it. This proposition was determined as early as the case of *Willson v. Black Bird Creek Marsh Co.*, 2 Pet., 245, and though often contested since, has invariably been reaffirmed. It is sufficient to cite the Federal decisions on this subject, as they are full to the point, and all speak the same language. *Spooner v. McConnell*, 1 McLean, 353; *Palmer v. Cuyahoga Co.*, 3 McLean, 226; *Columbus Ins. Co. v. Peoria Bridge Association*, 6 McLean, 70; *v. Terre Haute Bridge Co.*, 6 McLean, 237; *Woodman v. Kilbourn Manuf. Co.*, 1 Biss., 546; s. c., 1 Abb. U. S., 158; *Pound v. Turck*, 95 U. S. 459.

The states may therefore improve the natural highways by water, and they may improve the intersecting highways even though the result may be that the use of the highways by water is thereby to some extent impeded. Free navigation, therefore, does not necessarily mean navigation of the streams in their natural condition unobstructed and unimpeded. It remains to

be determined whether the free use of the natural streams, without tax, duty or impost, implies also a free use of the improved streams to the same extent and with the like exemption.

If the State improves its streams, it must of course in some manner provide a revenue to meet the expense. This might be done by a state tax levied upon all the people of the State, and the improved stream be then left perfectly free to the use of all. But the settled policy of this State is now against this method of making improvements in highways for the use of trade and commerce. The early experience of the State in the construction of railroads was most unfortunate, and came near prostrating the credit of the State and permanently injuring its prosperity at the very beginning of its history. To retrieve its fortunes the State early took steps to dispose of its public works, and the Constitution of 1850 undertook to guard against future dangers of the same sort by declaring that "the State shall not be a party to, or interested in, any work of internal improvement, nor engaged in carrying on any such work, except in the expenditure of grants to the State of land or other property." Art. 14, § 9. But for this provision there can scarcely be a doubt that it would have been competent for the State to improve the Manistee river, and to impose the burden on the people at large as a portion of the general State expenses, or to levy tolls for the use of the improvement, if that method of reimbursing the State should seem most expedient and just. The tolls would not be taxes, duties or imposts on the use of the navigable streams in their natural condition, but they would be tolls for the enjoyment of that which the State has expended in giving a new value to the stream, and producing a navigability which did not exist before. *Wisconsin River Imp. Co. v. Manson,* 43 Wis., 255. But empowering a corporation to make the improvement and to collect tolls for its use is only a different method of accomplishing the same result. The tolls are still collected for the use of the improvement only, the bur-

den upon commerce and navigation is the same, the State in adopting this method adheres to its settled policy, but without thereby in any manner imposing restraints or burdens which are beyond or different from those which would be imposed by the State itself if it constructed the improvements and collected a reasonable charge for their enjoyment. We therefore discover nothing in the provision for collecting tolls that is in any manner forbidden.

II. It is next objected that the improvement which the plea describes is not such an improvement as is intended by the statute. The statute authorizes the improvement of rivers "by deepening the channel thereof, and the construction of dams therein, and canals to connect therewith." The plea admits that no dams have been constructed, and it is insisted that the proposed improvement which the plea describes, "by removing obstructions from the river, by cutting channels through twenty-two several places in said river, designated as jams and numbered consecutively on said plan from one to twenty-two, both inclusive, by confining the waters of the river within the channel at the points designated on said plan," is not such a deepening of the channel as the statute intends. It is truly said that an obstruction may be a very slight affair; no more perhaps than a log or a stump in the stream, the removal of which could never be any just ground for charging tolls, or in any proper sense be called a deepening of the channel, and that deepening of the channel would be an improper term to apply to the taking out of any mere obstructions; and also that confining the waters within the channel would not be a deepening of the channel, and indeed as stated in the plea does not profess to be.

There is plausibility in this objection, but we do not understand how we can say that as matter of law the cutting through an obstruction is not a deepening of the channel of the river. An obstruction may be slight or considerable, temporary or permanent; but when it

acquires that degree of stability that the annual floods are not likely to remove it, we cannot with much propriety speak of the channel of the river as being the same thing it was before; as being the old channel with merely obstructions in it; but the obstructions themselves if upon the bottom of the river create a new channel, or make the old one shallow, so that to restore the channel to its former condition may be as properly called a deepening of the channel as though the channel were never otherwise than as the obstruction makes it. The improvement consists in deepening an existing channel, and it can be of no importance that there was once a time when the old channel was as deep as the improvement makes it. It would be a senseless construction of the statute that should provide for the deepening of the channel where it was always shallow, but not where the gradual accumulation of sand, rocks, stumps or logs had deprived it of navigability.

Nor can we say as matter of law that confining the water of the river within the channel will not deepen the channel. The confinement of the water must almost of necessity deepen it as it flows, because it keeps it together instead of allowing it to spread out over the adjacent territory. If a channel can only be deepened by excavating the bottom, then these banks cannot be said to deepen it, and whether it can be deepened otherwise or not may depend on what we understand by channel. Strictly speaking the channel is the bed of the stream over which its waters run, or it may be said to be a passage-way between banks through which flow the waters of the stream. But why this may not be deepened by raising the banks, as well as by excavating the bottom, when the effect is to deepen the flow, is not apparent. Indeed that it is thus deepened is self-evident. And when this method of deepening accomplishes the substantial purposes of the statute, as in many cases it undoubtedly will, we cannot say that it is not within the intent of the statute. We have no doubt whatever that it is. We say nothing now of the effect in deepening

the channel, of the increased flow within the new banks.

III. But it is said that the statute under which the respondent is incorporated is invalid because it confers upon the Board of Control the power to fix and establish tolls, but does not require its members to make any personal inspection of the river proposed to be improved, or provide any means for evidence upon which the board may determine the necessity for the improvements, or when the works are completed or so far constructed as to entitle the respondent to collect tolls, or give any hearing to parties interested, or contemplate that the board shall act upon anything but the *ex parte* statement of one of the corporate officers.

It must be admitted that the statute provides for no hearing of the parties whose interests may be affected by the improvement except when the board meet to consider the plan proposed for the improvement. Comp. L., § 2720. Section thirteen of the Incorporation Act (Comp. L., § 2728,) gives the corporation power to enter upon the work of improvement when the plan is approved. Section fifteen (Comp. L., § 2730), upon which the question here made arises, is as follows:

"Whenever any portion of said work shall be completed to the satisfaction of said Board of Control, and it is so far useful that in the opinion of said Board of Control tolls should be paid for the use thereof, said board may fix the tolls to be paid for the use of such portion until the whole of said work is completed; and whenever said improvements have been completed and accepted by said Board of Control, the rates of toll which any company organized under this act may charge for running rafts, timbers, logs, or lumber through said improved stream shall be fixed by said Board of Control, and may be graduated with reference to the distance run upon the portion of said stream improved by said company, and shall not be increased without the consent of said board, but may be changed from time to time by said board; but such toll shall not at any time be increased so that the sum shall amount to more than fifteen per cent a year upon the actual cost of such improvements after deducting the necessary expenses and repairs; and the said board shall, as far as may be practicable, so fix the rates of toll on timber, logs, and

lumber, that the same shall not at any time exceed the sum of twenty-five cents per thousand feet, board measure, on any stream where ten millions of feet or less are run in any one year; twenty cents per thousand feet, board measure, on any stream where thirty millions of feet or less are run in any one year; nor more than fifteen cents per thousand feet, board measure, on any stream where from thirty to fifty millions of feet are run in any one year; nor more than ten cents per thousand feet, board measure, on any stream where from fifty to one hundred millions of feet are run in any one year; nor more than five cents per thousand feet, board measure, on any stream where from one to two hundred millions of feet or more are run in any one year; and the collection of such tolls shall be confined strictly to that part or portion of a river or stream so improved, and to that class of floatables benefited by the improvement; and nothing in this act shall be construed to give jurisdiction to any corporation over any portion of a river or stream other than the portion specifically improved by such corporation. Such corporation shall cause to be made out and filed with said Board of Control, at or before its meeting on the last Wednesday in March, each year, the affidavit of its president or one of its directors, setting forth in detail, upon his best information and belief, what amount of timber, logs, and lumber will be run through any section or sections of the river improved by the company during that year, and that the official has made due and reasonable inquiry on the subject from persons lumbering on the river, and otherwise."

It was argued for the relator that the hearing for the establishment of tolls was in its nature a judicial hearing, of which all parties concerned were of right entitled to have notice. If that were the case it would obviously be impossible to give notice except in some general form of publication, since it could never be known in advance who the parties interested would be. The parties concerned in the tolls would be the parties who might have occasion to make use of the river for purposes of navigation, and these might or might not be the owners of the banks or persons living near them, or even persons living in the State. But in truth the fixing upon the amount of tolls is no more a judicial act than is the fixing of rates of fare or transportation by railroad, or the weight of a bushel of grain, or the speed of trains

through towns, or the rules for the going at large of animals. A judicial act implies a controversy between parties to which the law is applied, but the fixing of tolls is only prescribing a law in advance for the government of those whose occasions may bring them within its provisions.

As to the method in which the board shall be satisfied what tolls are proper, the statute is not specific, and beyond requiring a report from the corporation and an estimate of the year's business made under oath by one of the corporate officers, it does not point out the methods by which the board shall obtain the necessary information to enable them to perform their duties intelligently and justly. But the statute does not give to the report and affidavit any peculiar force as evidence, and it is undoubtedly within the province of the board 'to select its own methods of obtaining such information as may be important. As in the case of all other administrative duties, information may be gathered without being hampered by strictly legal rules, and the personal observation of the members may be availed of if they shall so choose. On this subject all we can say is that the statute has confided a discretionary authority to the Board of Control, which in the first place will determine the plan of the improvement, and afterwards on evidence satisfactory to themselves decide when the period has arrived when tolls may properly be levied, and grade these tolls and change them at discretion afterwards. Over all these matters we have no control, because the law has given none, and administrative questions are not in their nature judicial questions.

We find, then, in the law itself no inherent infirmity, and the Board of Control on whom the whole power is conferred having passed upon all the other questions which are presented by the demurrer, nothing remains for us to do but to give judgment for the respondent. It will be ordered accordingly.

The other Justices concurred.