489 P.2d 699

The STATE of Arizona et al., Appellants,

v.

BONELLI CATTLE COMPANY, a California corporation, Appellee.

No. 10030–PR.

Supreme Court of Arizona,
In Banc.

Oct. 4, 1971.

Gary K. Nelson, Atty. Gen., by Dale R. Shumway, Sp. Asst. Atty. Gen., Phoenix, for appellants.

Elmer C. Coker, Phoenix, for appellee.

STRUCKMEYER, Chief Justice.

This action was brought by Bonelli Cattle Company, a corporation, to quiet title to certain lands lying within the bed of the Colorado River in Mohave County, Arizona. The Superior Court on an agreed statement of facts entered judgment quieting title against the State and the judgment was affirmed by the Court of Appeals, 11 Ariz.App. 412, 464 P.2d 999. Opinion of the Court of Appeals vacated. Judgment of the Superior Court reversed.

The issue to be determined is whether ownership of Arizona in the bed and banks of the Colorado River acquired by erosion has been lost because dredging has channelized the water of the river, confining it to a part of the bed.

Bonelli claims as the owner the East half of Section 3, Township 19 North, Range 22 West of the Gila and Salt River Base and Meridian. It acquired title by deed dated August 12, 1955. Its grantor traces its title to a patent by the United States dated November 5, 1910 issued to Santa Fe Pacific Railroad Company.

A United States Geological Survey map of this area dated 1902–1903 shows that at that time the river's east bank was approximately one-quarter of a mile west of Section 3. No evidence was produced as to the course of the river thereafter until 1938, but there seems to be general agreement that during this period the river moved steadily eastward. By April 24, 1938 the river's channel covered all of the east half of Section 3 except a small portion of the southeast corner.

In the year 1938, the flow of the river was brought under control by the construction of the Hoover Dam, and thereafter water was released only in such quantities as was suitable for downstream irrigation. This discharge of water apparently has not been sufficient to cause any significant erosion or reliction in the river. By a map of the United States Geological Survey, Department of Interior, (the Davis Dam Quadrangle) dated 1950, the river is shown as being nearly three-fourths of a mile wide, flowing in part over the west half of Section 3. In 1959 and 1960 the river was dredged by the United States Department of Interior and the water which had theretofore spread over almost the entire width of the river's bed was confined to the dredged portion, principally within the west half of Section 4 and only partially within the east half of Section 3. That part of the former channel on the east half of Section 3, over which water no longer flows, is the subject matter of this controversy. The plaintiff, Bonelli, is claiming the exposed portion of the bed of the river.

Ordinarily in the United States the bed of a non-navigable river or stream is owned by the riparian owners. Where the stream forms the boundary between owners, each owns on his side to the middle thread. However, the rule is not always applied to navigable rivers. By congressional enactment, the State of Arizona owns title to the beds of all navigable streams within its borders, 67 U.S.Stat. 30, 43 U.S.C. § 1311; Kansas v. Colorado, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956. Since the Colorado River is not wholly within Arizona's borders, but is, itself, the border, Arizona's title extends from the center of the channel eastward to the river's high water line. Arizona v. California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154; *and see* Mumford v. Wardwell, 73 U.S. 423, 18 L.Ed. 756; Pollard v. Hagan, 44 U.S. 212, 11 L.Ed. 565; Morgan v. Colorado River Indian Tribe, 103 Ariz. 425, 443 P.2d 421. As an aside, it may be observed that the boundary between Arizona and Nevada is not the channel's thread. The boundary has been fixed by agreement between the two states.

It is common knowledge that rivers move sometimes so slowly as to be imperceptible during the lifetime of any single individual, and sometimes so rapidly by floods that the river's banks visibly disintegrate. Where the change is sudden and rapid, the change is said to be by avulsion. United States v. Claridge et al., U. S. District Court, Phoenix, 279 F.Supp. 87; Hirt v. Entus, 37 Wash.2d 418, 224 P.2d 620. Erosion, on the other hand, is the eating away of the soil by the river's current, and is a gradual, imperceptible process. Where the river moves by erosion, the boundary moves with the stream, but where the river moves by avulsion, the boundary remains in the center of the old channel, Nebraska v. Iowa, 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186; State v. Jacobs, 93 Ariz. 336, 380 P.2d 998.

From the statement of facts and the exhibits introduced in the instant case, we are unable to say whether the eastward movement of the Colorado River between 1903 and 1938 was by avulsion or erosion. It is to be recognized that avulsive changes

**468**

are generally events so momentous that evidence is available to establish them. In the instant case, the failure to produce such evidence is an indication that the changes in the watercourse were imperceptible. The rule of law is that in the absence of clear evidence to the contrary, the movement of the river will be presumed to be by erosion, Arnd v. Harrington, 227 Iowa 43, 287 N.W. 292; Kitteridge v. Ritter, 172 Iowa 55, 151 N.W. 1097.

It follows from what has been said that as the river moved eastward across Section 3, the thread of its channel moved with it and the title of the State of Arizona to the east one-half of the river bed also shifted correspondingly,—the east high water line of the river finally becoming the plaintiff's west boundary. As the river moved eastward, engulfing most of Section 3 in the channel of the river, the land to which plaintiff held title decreased so that, by 1938, the owners of the east one-half of Section 3 had, by the operation of natural forces, lost most of it to Arizona.

■ It is Bonelli's position that when the United States Government dredged the river in 1959, confining the waters thereof to a portion of the river's bed so as to prevent unreasonable loss of water by absorption and evaporation, the portion of the bed which was not used for the flow of water reverted to the previous owners. But we do not think so.

■ A stream is a watercourse having banks and channel through which waters flow, at least periodically. Southern Pacific Co. v. Proebstel, 61 Ariz. 412, 150 P.2d 81. As has been said:

"A watercourse does not lose its character as such by reason of the fact that it is improved by deepening or is artificially controlled, nor because it is used as a conduit to carry other waters. Again, the character of a watercourse is not changed by the fact that a pond is created by a dam. *Nor does a watercourse lose its character as such because all the water has been diverted there-from, no matter for how long a period* * * * *nor by reason of the fact that the water has all been dammed at a place far up the stream.* * * * *"* (Emphasis in original.)  Smith v. City of Los Angeles, 66 Cal.App.2d 562, 153 P.2d 69.

Obviously, a river does not have to flow continuously across the whole of its bed to the high water mark in order to avoid a claim by abutting owners to a part of the river's bed. The channel of a river is the bed of the stream over which its waters run, Benjamin v. Manistee River Imp. Co., 42 Mich. 628, 4 N.W. 483, and the bed of a river is the space contained between its banks, Pulley v. Municipality No. 2, 18 La. 278. Arizona does not lose title to the bed of the river to high water mark simply because the river has been dammed and its water channelized to a part of the bed.

The plaintiff argues what it calls the "artificial accretion" theory, urging that an abutting owner is entitled to the accretion caused by artificial conditions over which he has no control. An accretion is a "gradual and imperceptible accumulation of land by natural causes," Black's Law Dictionary. In the instant case, the exposed portion of the channel was not brought into existence gradually or imperceptibly. The exposure was man-made and the channel was uncovered rapidly and perceptibly.

■ The plaintiff also argues what it calls the "re-emergence" theory. This occurs where a river which formerly eroded an abutting owner's land recedes so that the eroded land reappears—a process known as reliction. Reliction is an increase of land by a permanent withdrawal or retrogression of a river. We believe, however, that the dredging of the river is an engineering relocation of the waters of the river by artificial means and is not a true case of withdrawal or retrogression.

We are not unaware that there are jurisdictions which have held that the land to the low water mark of a river or lake

belongs to the abutting owners, *see e. g.*, State Engineer v. Cowles Brothers, Inc., Nev., 478 P.2d 159. We think, however, the better rule is that the courts have no authority to give away the title to land which clearly belongs to the state. Where, as here, the abutting owner's title extends only to the high water mark, and the bed and banks belong to the state, we can find no solid legal reason for concluding that the land below the high water mark to the water's edge belongs to the abutting owners.

■ Where a river shifts to a new location as a result of unnatural forces, the state does not lose title to the bed of the stream in the old location. People ex rel. Dept. of Public Works v. Shasta Pipe and Supply Co., 264 Cal.App. 520, 70 Cal. Rptr. 618; Padgett v. Central and Southern Florida Flood Control District (Fla.), 178 So.2d 900; State v. Aucoin, 206 La. 786, 20 So.2d 136; Ray v. State (Tex.Civ. App.), 153 S.W.2d 660; Wilemon v. City and County of Dallas Levee Imp. Dist. (Tex.Civ.App.), 264 S.W.2d 543 (cert. den. 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed. 654).

The judgment of the Superior Court is reversed with directions to enter judgment quieting title in the State of Arizona from the Nevada boundary to the high water mark.

HAYS, V. C. J., ROBERT O. ROYLSTON, P. J., Superior Court, Pima County, WARREN L. McCARTHY, J., Superior Court, Maricopa County, concur.

NOTE: Justices JESSE A. UDALL and JAMES DUKE CAMERON having announced their disqualification to sit in the determination of this matter, the Honorable ROBERT O. ROYLSTON and Honorable WARREN L. McCARTHY were called to sit in their stead.

LOCKWOOD, Justice (dissenting).

I cannot concur with the result at which Chief Justice Struckmeyer arrives in this case.

Chief Justice Struckmeyer has amply set forth the facts in the case, and his discussion of rights of a riparian proprietor in land under the common law is an excellent dissertation up to a point.

It must be borne in mind, of course, that the question here involves not the right to the *use of the water* of a river or stream, but involves the title to land bordering on, or beneath such river or stream. In the case of *use* of the water, the common law riparian right of owners of land bordering the river or stream was abrogated and the doctrine of prior appropriation established by the First Territorial Legislature in 1864 and has obtained by statute and Arizona Constitution ever since. But there are other "riparian rights" belonging to owners of land bordering rivers or streams unaffected by the Constitution and statutes regarding use of such waters by appropriation. There is no inconsistency in our constitutional and statutory provisions repudiating the doctrine of riparian rights and establishing the doctrine of prior appropriation (so far as the waters named by the legislative acts are concerned) and in the application of riparian rights in landowners to increase or decrease of land by accretion or reliction. See Maricopa County Municipal Water Conservation Dist. No. 1 v. Southwest Cotton Co., 39 Ariz. 65, 4 P.2d 369; State v. Gunther & Shirley Co., 5 Ariz.App. 77, 423 P.2d 352.

As early as 1864 the Arizona Territorial Legislature first enunciated the policy of adoption of the common law as "the rule of decision" and as modified by subsequent legislative acts, that rule has obtained to the present. We must, however, examine to what extent the common law has become a fixed "rule of decision". An examination of succeeding legislative enactments is therefore illuminating.

A.R.S. § 1–201 presently reads as follows:

*"The common law only so far as it is consistent with and adapted to the natural and physical conditions of this state and the necessities of the people thereof,* and

not repugnant to or inconsistent with the constitution of the United States or the constitution or laws of this state, *or established customs of the people of this state, is adopted and shall be the rule of decision in all courts of this state."* (Emphasis added.)

The Territorial Legislature in 1864 adopted § 7 of Chapter 61, which reads as follows:

"The common law of England, so far as it is not repugnant to, or inconsistent with, the constitution and laws of the United States, or the bill of rights or laws of this Territory, is hereby adopted, and shall be the rule of decision in all the courts of this Territory."

The same statutory provision was carried forward appearing as § 3438 of the Compiled Statutes of 1877, as follows:

"The common law of England, so far as it is not repugnant to, or inconsistent with, the constitution and laws of the United States, or the bill of rights or laws of this Territory, is hereby adopted, and shall be the rule of decision in all the courts of this Territory."

In 1887 the statutes were revised. The provision adopting the common law was significantly modified to read as follows:

"The common law of England *so far only as it is consistent with and adapted to the natural and physical condition of this territory, and the necessities of the people* thereof, and not repugnant to, or inconsistent with the constitution of the United States, or bill of rights, or laws of this territory, *or established customs of the people of this territory,* is hereby adopted and shall be the rule of decision in all the courts of this territory." (Emphasis supplied.) R.S.A.1887, § 2935.

Thereafter a new code was enacted in 1901 by the Territorial Legislature. Therein all statute laws and titles of the Revised Statutes of 1887 were repealed (except a certain Title 3 regarding assignment for benefits of creditors, not here relevant). In this revision no general adoption of the common law as "the rule of decision" was

adopted. The only reference thereto was regarding evidence, reading:

"The common law as now practiced and understood shall in its application to evidence, be followed and practiced by the courts of this territory, so far as the same may not be inconsistent with this title or any other law." Section 2533, R.S.A. 1901.

However, the Territorial Legislature of 1907 on March 5th adopted Chapter 10, which was entitled "To Revive Chapter Five of Title LX of the Revised Statutes of 1887." In Chapter 10, § 8, the Legislature reenacted in practically identical wording former § 2935 of the Revised Statutes of 1887, reading as follows:

"The Common Law, *so far only as it is consistent with, and adapted to the natural and physical condition of this Territory, and the necessities of the people thereof,* and not repugnant to, or inconsistent with the Constitution of the United States, or bill of rights, or laws of this Territory, *or established customs of the people of this Territory,* is hereby adopted and shall be the rule of decision in all courts of this Territory." Session Laws of the 24th Legislative Assembly of the Territory of Arizona of 1907, Chapter 10, § 8, p. 11. (Emphasis supplied.)

In the first State Code adopted in 1913, § 5555 is practically identical to the 1907 provision. The same statute was carried forward in the 1928 Code as § 3043, and thereafter it was carried forward without change to the present § 1–201, A.R.S. 1956, still in effect.

The First Territorial Legislature, in 1864 had responded to the urging of Governor Goodwin that they "adopt a permanent policy as to the use of water for agriculture as well as mining purposes." The Legislature adopted Article 22 of the Bill of Rights, reading as follows:

"All streams, lakes, and ponds of water capable of being used for the purposes of navigation or irrigation, are hereby declared to be public property; and no in-

dividual or corporation shall have the right to appropriate them exclusively to their own private use except under such equitable regulations and restrictions as the Legislature shall provide for that purpose."

Immediately thereafter the language, supra, of Chapter 55 of the Howell Code was enacted, which also established the policy of appropriation as opposed to riparian rights in waters of rivers, creeks and streams of running water in the Territory of Arizona. Thereafter, in the case of Boquillas Land and Cattle Co. v. St. David Coop. Assn., 11 Ariz. 128, 89 P. 504 (filed March 22, 1907), affirmed Boquillas Land & Cattle Co. v. Curtis, 213 U.S. 339, 29 S.Ct. 493, 53 L.Ed. 822 (1909), the right of the state to abrogate the common law rules of riparian rights to the use of water, and to establish the right of appropriation of water, was upheld. The Court discussed the development of the custom of using irrigation water by right of appropriation without regard to the riparian character of the lands being in force by virtue of Mexican Law before the acquisition of the State of Arizona under the Treaty of Guadalupe Hidalgo and the Gadsden Purchase. The Court stated: "Our statutes, as well as those of New Mexico, seem to have had their origin in the Mexican law, as modified by custom." 11 Ariz. at 139, 89 P. at 508.

In a concurring opinion outstanding for its brevity and clarity, Territorial Supreme Court Judge Nave commented on the common law as follows:

"The essence of the common law is flexibility and adaptability. It is not a body of fixed rules, but is the best product of human reason applied to the premises of the ordinary and extraordinary conditions of life, as, from time to time, they are brought before tribunals. Hence, though the common law is homogeneous, yet it finds widely different expression in different jurisdictions. Should the common law become so crystalized that its expressions must take the same form wherever the common law system pre-

vails, irrespective of physical, social, or other conditions peculiar to the locality, it would cease to be the common law of history, and would be but an inelastic and arbitrary code. The common law historically has carried with it, and as part of it, the principle that precedents —earlier deductions from known conditions—must yield to the reason of different or modified conditions. This is expressed, and analogously applied in People v. [Canal] Appraisers, 33 N.Y. 461, where it is said: 'No doctrine is better settled than that such portions of the law of England as are not adapted to our condition form no part of the law of this state. This exception includes, not only such laws as are inconsistent with the spirit of our institutions, but such as were framed with special reference to the physical condition of a country differing widely from our own. It is contrary to the spirit of the common law itself to apply a rule founded on a particular reason to a case where that reason utterly fails.'" 11 Ariz. at 140, 89 P. at 508.

And in Maricopa County Municipal Water Conserv. Dist. No. 1 v. Southwest Cotton Co., 39 Ariz. 65, 4 P.2d 369 the Court paraphrased the language of Judge Nave and stated:

"It is true that the common law is not in its nature and character an absolute, fixed, and inflexible system; it is rather a system of general juridical truths, founded on reason, natural justice, and enlightened public policy, which are conditionally explained with the progress of society, and which adapt themselves to the gradual changes of that society and the conditions, exigencies, and usages of the country. It is never entirely stationary, but is modified and extended by analogous construction and custom so as to embrace new relations springing up from time to time from an amelioration or change of society, or different physical conditions arising in the countries to which it is to be applied. Should it ever become so crystallized that its ex-

pressions must take the same form, irrespective of physical, social, or other conditions, peculiar to the locality or the character and habits of the people, it would cease to be the common law, and become a rigid and arbitrary code. And we think, as suggested by the Supreme Court of the United States in Boquillas, etc., Co. v. St. David etc., Ass'n., supra, the doctrine of liberal interpretation set forth in paragraph 2935, supra, was equally implied in the Howell Code. But no judicial interpretation of the common law can ever prevail against an explicit declaration of public policy made by the Legislature when acting within its jurisdiction. This declaration we have seen was made in the Bill of Rights and the Howell Code, and it has never been changed in substance up to the present." 39 Ariz. at 81, 82, 4 P.2d at 375.

The question here involved is one of first impression, and one on which our Legislature has never spoken through its statutory powers. But I believe in view of the importance of the agricultural developments bordering the Colorado River, and our constitutional policy prohibiting a taking of private property without just compensation, our decison should not be based on a construction of common law out of harmony with the conditions and usages of a burgeoning agricultural industry which flourishes most effectively by its use of land bordering the Colorado River.

It is well established that upon the formation of each new state in the Union, it became the owner of the navigable rivers therein together with the land underlying such waters. Under Joint Resolution No. 8 (21 August 1911), 37 U.S.Stat. 39, Congress authorized the admission of Arizona with other States of the Union upon an "equal footing". Therefore the State of Arizona acquired sovereignty over the navigable rivers within its borders, together with the land underlying the same. The Colorado River, at the location in question here, is a navigable river by adjudication. Arizona v. California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154. No new rights were conferred by Congress in 67 U.S.Stat. 29, 43 U.S.C. § 1301, such statute merely confirming as a "quit-claim" all previous rights in navigable rivers. People v. Hecker, 179 Cal.App.2d 823, 4 Cal.Rptr. 334 (1960). Since the Colorado River formed the boundary between Arizona and the states of California and Nevada, the sovereignty of Arizona extended only to the middle of the stream of the Colorado River on such boundary, and eastward to the river's high water line, at the time Arizona became a state. Owners of land abutting the river owned only to the high water mark, under the common law. As to their rights upon a change in the river's banks, the common law rule with regard to accretion and reliction was not necessarily in conflict with Arizona law. The nature of the title to the river bed so acquired, however, is another matter. As stated in State v. R. E. Janes Gravel Co., 175 S.W.2d 739 (Tex. Civ.App.1943; reversed on other grounds in Maufrais v. State, 142 Tex. 559, 180 S.W. 2d 144 (1944)), "the title to a riparian owner is 'a base fee, determinable upon the occupancy of his soil by the river,' and that the title of the State to the river bed is likewise a 'base or qualified' fee, 'determinable in favor of the riparians upon the abandonment of the bed by the river.'" 175 S.W.2d at 741.

This holding is entirely consistent with the provision in our Constitution that no private property should be taken or damaged for public or private use without just compensation having been first made. Article 2, § 17, Arizona Constitution, A.R.S. The state properly has a governmental interest in the control of the navigable river, and therefore in the land beneath it, so long as the river covers the land of a riparian proprietor. However, it is when the river is withdrawn from land originally owned by the riparian proprietor that governmental interest ceases to exist. It is more consistent with Article 2, § 17 of our Constitution that the riparian proprietor's property right, hitherto subjected to the qualified fee of the state by the accretive move-

ment of the river, should be completely restored to him; otherwise there is a taking by the state of private property for public use without just compensation. To permit the state to retain title to the property under such circumstances would controvert the provision of the Constitution.

To hold, as I believe we should, that the state's qualified title is terminated, and the riparian proprietor's title is released from its subservience, is in harmony with and is not repugnant to or inconsistent with the provisions of Article 2, § 17, supra, or of A.R.S. § 1–201.

Supporting this conclusion, Michigan has held that riparian land rights are property for the taking or destruction of which by the state compensation must be made. Klais v. Danowski, 373 Mich. 262, 129 N.W. 2d 414 (1964):

"The question is raised whether the patentees and those claiming under them have lost from the then dry lands originally patented to them title to so much of the private claims as, subsequent to the date of patent, may have become inundated by rising lake levels or through the processes of *avulsion or erosion.* That the answer should be held to be in the negative is supported by Mulry v. Norton, 100 N.Y. 424, 3 N.E. 581, In re City of New York, 256 N.Y. 217, 176 N.E. 171, In re City of New York v. Realty Associate, 256 N.Y. 222, 176 N.E. 173, and City of Chicago v. Ward, 169 Ill. 392, 48 N.E. 927, 38 L.R.A. 849. The owner's continuing title and ownership, after the lands became submerged and, thereafter, when their restoration to dry condition results *either from natural forces or even by artificial, manmade means,* is indicated by those cases. We hold to that same effect." 373 Mich. at 276–277, 129 N.W. 2d at 421. (Emphasis supplied.)

Likewise the State of California has held that all of its navigable waterways and the lands lying beneath them are held by the state "as trustee of a public trust for the benefit of the people". Colberg, Inc. v. State ex rel. Dept. of Public Works, 67 Cal.

2d 408, 62 Cal.Rptr. 401, 432 P.2d 3 (1967), cert. den. 390 U.S. 949, 88 S.Ct. 1037, 19 L.Ed.2d 1139 (1968), citing People v. Gold Run D. & M. Co., 66 Cal. 138, 151, 4 P. 1152 (1884); Martin v. Waddell's Lessee, 41 U.S. (16 Pet.) 367, 10 L.Ed. 997 (1842); Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894); Miramar Company v. City of Santa Barbara, 23 Cal.2d 170, 143 P.2d 1 (1943). The law with regard to the sovereignty of California over navigable streams was early declared in the case of Eldridge v. Cowell, 4 Cal. 80 (1854), in the following language:

"She [the State of California] holds the complete sovereignty over her navigable bays and rivers, and although her ownership is, by the law of nations, and the common and civil law, attributed to her for the purpose of preserving the public easement, or right of navigation, there is nothing to prevent the exercise of her power in certain cases to destroy the easement, in order to subserve the general good, which, when done, subjects the land to private proprietorship." 4 Cal. at 87.

In Colberg, Inc. v. State ex rel. Dept. of Pub. Works, supra, the Supreme Court of California stated as follows:

"As we have shown above, the power of the State of California to deal with its navigable waters, though subject to the superior federal power, is considerably wider in scope than that paramount power. The state, as owner of its navigable waterways subject to a trust for the benefit of the people, may act relative to those waterways in any manner consistent with the improvement of commercial traffic and intercourse. We are of the further view that the law of California burdens property riparian or littoral to navigable waters with a servitude commensurate with the power of the state over such navigable waters, and that 'when the act [of the state] is done, *if it does not embrace the actual taking of property,* but results merely in some injurious effect upon the property, the

property owner must, for the sake of the general welfare, yield uncompensated obedience.' (Gray v. Reclamation District No. 1500, supra, 174 Cal. 622, 636, 163 P. 1024, 1030.)" (Emphasis supplied.)

The State of Texas departs somewhat from the English Common Law as to rights of riparian proprietors in land abutting on navigable rivers when the river has abandoned its course through either avulsive or accretive processes. When the Republic of Texas was formed, by treaty with Mexico, it agreed to protect existing property rights of owners under various Mexican land grants. Nevertheless in 1840 the Republic of Texas adopted the Common Law as the rule of decision with certain exceptions as to rights in certain Mexican land grants. In the landmark case of Manry v. Robinson et al., 122 Tex. 213, 56 S.W.2d 438 (1932), a most illuminating discussion of the development of rights of riparian owners in and to land, is found. The Court there traced the development of riparian land rights from their inception in Roman law (commonly referred to as the civil law) through the adaptations of the civil law by the various countries into which it was carried by the Romans. These of course included England, France, Spain and Mexico, and our own country. The Laws of England with reference to rivers was founded upon the Roman Law but with adaptations to meet the conditions existing in England. Similarly, France, Spain, Mexico and the various states in the United States adopted interpretations best adapted to their physical conditions and customs.

The development of the law with regard to rights of riparian proprietors in the States of California and Texas were strongly influenced by the fact that the title to much of the land derived from Mexican land grants. Some of the land within the boundaries of the now State of Arizona, also derived title from Mexican land grants. Likewise, having been a part of Mexico, Arizona was subject to many of the same customs which arose out of Mexican law, which in general followed the civil law. Boquillas, supra.

With regard to the development of laws with reference to rivers, from Roman Civil Law through the English Common Law, and its various adaptations in our Southwest, we quote from the historical account given in Manry, supra:

"There can be no doubt but that the laws of England with reference to rivers were founded upon the Roman law. Authorities supra and post; Hardin v. Jordan, 140 U.S. 371, 390, 11 S.Ct. 808, 35 L.Ed. 428. The two systems of law were similar in many respects, but differed in some material particulars. Under the civil law, *all perennial streams were public, while under the common law navigable streams within tidewater limits only, in the absence of prescription, dedication, or act of Parliament, were public.* Authorities supra; Gould on Waters (3d Ed.) §§ 51, 52, 53; Coulson & Forbes on Waters (4th Ed.) pp. 77, 78, 449, 450; Halsbury's Laws of England, vol. 25, p. 398, § 760; Hardin v. Jordan, 140 U.S. 371, 383, 11 S.Ct. 808, 35 L.Ed. 428.

"There is a difference of opinion among writers on the Roman law as to whether or not the beds of public streams under that system of jurisprudence belonged to the sovereign or to the owners of adjacent lands.

"England in adopting the Roman law as to its nontidal streams adopted the construction insisted on by Selden, Vinnius, Mr. Farnham (vol. 1, § 49), and others, *that the title of the riparians extended to the center of the streams, because that construction was suitable to her conditions; while France, Spain, and Mexico adopted that interpretation indicated by Gaius (Scott's Civil Law, vol. 9, p. 107), and followed generally by the American courts (Farnham, vol. 1, § 49), that title to the beds of all navigable streams, so long as occupied, was in the*

*public or the sovereign, because that construction was suitable to their conditions.*

"Each of the nations named in selecting its interpretation of the Roman law as to the ownership of stream beds, *so long as occupied* chose that rule which was best suited to its conditions. *The jurisprudence of all the nations mentioned, France, Spain, Mexico, Texas (down to 1840), and England (as to non-tidal streams), however, agree with the Roman law, that when a river abandons its bed and selects a new channel, the abandoned bed becomes the property of the adjacent land owners.* Authorities supra; Farnham on Waters, vol. 1, § 49." 122 Tex. at 230–231, 56 S.W.2d at 446. (Emphasis supplied.)

\* \* \* \* \* \*

"Under the English common law the sovereign owned only those portions of river beds which were within tidewater limits. River calls extended to the medial line of boundary streams above tidewater, whether navigable or not, and the beds were the property of the riparians. Hardin v. Jordan, 140 U.S. 371, 383, 388, 11 S.Ct. 808, 35 L.Ed. 428; Shively v. Bowlby, 152 U.S. 1, 11, 14 S.Ct. 548, 38 L.Ed. 331; 4 Ruling Case Law, p. 82, §§ 12, 13; p. 83, § 15; 9 Corpus Juris, p. 184, § 60, p. 185, § 61; Farnham on Water Rights, vol. 1, § 48, vol. 2, §§ 413, 415; Kinkead v. Turgeon, 74 Neb. 573, 104 N.W. 1061, 109 N.W. 744, 1 L.R.A. (N.S.) 762, 7 L.R.A. (N.S.) 316, 121 Am.St.Rep. 740, 13 Ann.Cas. 43; 27 Ruling Case Law, p. 1358, §§ 268, 272; 9 Corpus Juris, p. 184, § 59; p. 185, §§ 61, 63; Packer v. Bird, 137 U.S. 661, 666, 11 S.Ct. 210, 34 L.Ed. 819; Lorman v. Benson, 8 Mich. 18, 77 Am.Dec. 435; Kent's Commentaries (13th Ed.) vol. 3, pp. 592, 593; Coulson & Forbes' Law of Waters (In England), pp. 91, 77; Halsbury's Laws of England, vol. 28, §§ 744, 756, 757.

"The beds of navigable streams *above tidewater* were parts of the coterminous estates, but so long as occupied by naviga-ble waters the ownership and control by the owners was limited by the public right of navigation, predicated upon custom, dedication, or act of Parliament, but not upon original ownership and control by the sovereign, nor upon the common law. Halsbury's Laws of England, vol. 28, p. 406, § 784; p. 398, §§ 760, 761, 762; p. 396, § 756; Coulson & Forbes on Waters (4th Ed.) p. 450; Hale's De Jure Maris as published in Moore's History and Laws of the Foreshore, etc. (3d Ed.) p. 370 et seq.; Farnham on Waters, vol. 1, § 48; Kinkead v. Turgeon, 74 Neb. 573, 104 N.W. 1061, 109 N.W. 744, 1 L.R.A. (N.S.) 762, 7 L.R.A. (N.S.) 316, 121 Am.St.Rep. 740, 743, 13 Ann.Cas. 43." Id., 122 Tex. at 229, 56 S.W.2d at 445–446. (Emphasis in original.)

\* \* \* \* \* \*

"These illustrations suffice to show that as to the law of streams we have only adopted such rules of the common law as are suitable to our conditions and as are in harmony with the basic principles of our jurisprudence with reference to the law of waters.

"We will now examine the question as to whether or not we have adopted the *claimed* common law rule that the beds of all navigable streams upon abandonment are the property of the state.

"No such rule ever existed under the common law of England. There are respectable authorities for the statement that the beds of navigable streams *within tidewater limits* upon abandonment remain the property of the Crown; but this is because the rivers and their beds where the tide ebbs and flows are *arms of the sea,* and not because of navigability alone. Authorities supra; Bacon's Abridgment, vol. 8, pp. 14, 19; Farnham on Waters, vol. 1, § 38; Hale's De Jure Maris in Moore's History of the Foreshore, etc. (3d Ed.) pp. 378 to 380; Mayor of Carlisle v. Graham, L.R. Ex., vol. 4, p. 360.

"The rule of the common law as to rivers above tidewater, which are, as

Bacon's Abridgment says, *'no original part or appendix of the sea,'* was, and is, that the adjacent lands extend to the medial line, burdened with certain easements incident to navigation, if navigable, and that upon abandonment the beds in full title pass to the riparian owners. Authorities supra; Bacon's Abridgment, vol. 8, p. 14; Farnham on Waters, vol. 1, § 48; Hale's De Jure Maris in Moore's History of the Foreshore, etc. (3d Ed.) pp. 370 to 373; Kinkead v. Turgeon, 74 Neb. 573, 104 N.W. 1061, 109 N.W. 744, 1 L.R.A. (N.S.) 762, 7 L.R.A. (N.S.) 316, 121 Am.St.Rep. 740, 13 Ann.Cas. 43.

"In our opinion, in adopting the common law, we adopted the last-named rule, since the rule to the extent that it assigned the beds of nontidal navigable streams upon abandonment to the riparians was consistent with our then established system of jurisprudence, and better suited to our conditions than the other rule of the common law stated above." Id., 122 Tex. at 233, 56 S.W.2d at 447–448. (Emphasis in original.)

The United States government through its Bureau of Reclamation, without permission or consent from or by plaintiff or any express consent by the State (although there is an indication that the State approved the rechanneling project), changed the channel of the Colorado River by relocating and rechanneling it in the latter part of 1959 and the early part of 1960. This caused an abandonment by the river of a large portion of Section 3 which was originally owned, by virtue of United States patent, by those from whom plaintiff derived title. Under the customs established in the Arizona Territory, by reference to Mexican law, the plaintiff would thereby have regained his land, bounded by the high water mark of the rechanneled river. Otherwise, the state, no longer having a governmental capacity over land formerly existing by virtue of its being beneath a navigable river, would be in effect taking property of plaintiff without compensation.

I would, for the foregoing reasons, affirm the judgment of the trial court quieting title in the plaintiff to the land in question.